PEPPER'S STEEL & ALLOYS, INC., Plaintiff,

v.

LISSNER MINERALS & METALS, INC., Defendant.

No. 78 Civ. 2838 (PNL).

United States District Court, S. D. New York.

Nov. 26, 1979.

On Damages June 3, 1980.

Laurence Greenapple, Bobrow, Greenapple, Burton, Distler-Midler, New York City, for plaintiff.

Robert Aaronson, Solin & Breindel, New York City, for defendant.

LEVAL, District Judge.

This is an action for breach of contracts for the sale of copper scrap brought by the seller Pepper's Steel & Alloys, Inc. ("Pepper's" or "plaintiff") against the buyer Lissner Minerals and Metals, Inc. ("Lissner" or "defendant"). The contracts in question

were unique inventions of Lissner designed in late 1975 to permit Lissner to obtain copper scrap from dealers who at the time were reluctant to sell because of depressed prices. Subsequent experience has taught Lissner that the contracts it designed carried disadvantages to itself which it had incorrectly assessed. Accordingly, Lissner now seeks to escape the predicament it created for itself by seeking a judicial interpretation of the contracts which differs from their apparent meaning and from the understandings on both sides at the time the contracts were made. I find that the contracts are correctly construed as plaintiff asserts and that the defendant Lissner's contention as to the meaning of the contracts is without basis.

## The Parties

At all relevant times, Pepper's was a Florida corporation with its principal office in Miami, Florida, engaged in the business of a copper scrap dealer. The common activities of the business included buying copper scrap, processing or cleaning the copper scrap, packaging the scrap after processing, and selling it. Norton Bloom was a founder, a primary shareholder, the president and a director of Pepper's and has been a copper scrap dealer for approximately 20 years.

At all relevant times, Lissner was a New York corporation with its principal office in New York, New York. Lissner was a copper "merchant" and broker. A part of its business involved dealings in copper scrap, including purchasing copper scrap from scrap dealers such as Pepper's, in some cases causing it to be refined, and reselling the scrap or refined copper. During the following times the following persons held the following positions at Lissner:

(a) Robert Joblove:

President—From approximately 1972–October 14, 1977

Director—Prior to 1975–October 14, 1977

(b) Michael Lissner:

President—October 14, 1977–present

Director—Prior to June 1, 1976–present

Vice-President—1973–October, 1977

Shareholder—Prior to 1976–77

(c) Glenn Lytton:

Assistant Buyer and Metal (copper scrap) Trader—April, 1975–July, 1977

(d) Robert Steinfeld:

Vice President—Prior to 1975–November, 1976

(e) Fletcher Morgan:

Scrap trader—December, 1976–August, 1977

(f) Jeffrey Farber:

Treasurer—June, 1976–November, 1977

(g) Mary Ann Valen:

Secretary to Robert Joblove—Prior to June 1, 1976–March, 1978

(h) Mort Lissner:

Director—Prior to June 1, 1976–present

Vice President, Shareholder

Robert Joblove had the primary responsibility for supervising the daily operations of Lissner in New York. Michael Lissner was responsible for overseeing Lissner in New York, including Robert Joblove. Robert Steinfeld was in charge of copper scrap purchasing by Lissner, and, together with Glenn Lytton and Fletcher Morgan, purchased copper scrap for Lissner. Mort Lissner had general supervisory responsibilities with respect to Lissner. Lytton had purchased and sold copper scrap for approximately 8 to 10 years. He reported to Steinfeld and Joblove while he was at Lissner.

## The Contracts

During the period from approximately the end of 1975 to the end of 1976, Lissner had contracted with third parties for the sale by Lissner of copper scrap. In order to perform these outstanding contractual obligations, Lissner needed to obtain copper scrap. At the same time, scrap dealers were reluctant to sell. Copper prices were low based on prior experience. It was widely anticipated that they would rise in time. Accordingly dealers (like Pepper's) preferred to hold their inventories with the

expectation of selling at better prices in the future.

In order to induce scrap dealers to part with their inventories during this period of low prices, Lissner devised a new form of contract under which delivery of the scrap would be made promptly but final pricing of the sale would not occur until an unspecified future date to be selected at the option of the seller.

This form of contract was the invention of Robert Steinfeld, Lissner's vice-president in charge of scrap purchasing. After discussion and receipt of approval from superiors, Steinfeld instructed his traders to utilize this new contract form to induce scrap dealers to sell to Lissner. In accordance with these instructions, Glenn Lytton, a Lissner trader, called Bloom at Pepper's in early 1976. Pepper's and Lissner had an established trading relationship. Lytton was the buyer at Lissner who customarily dealt with Pepper's.

Lytton told Bloom that in order to induce dealers to sell it scrap Lissner was buying under a new kind of contract which postponed pricing until "whenever" the seller would elect to price. Lytton read Bloom the terms from the contract form. Bloom, at first a bit skeptical, commented that it seemed radical and asked if there would be surprises down the road. Lytton explained that the contract had been designed because Lissner needed to acquire material and assured him that there would be nothing down the road, nothing hidden, that the contract would be exactly as Lytton explained. Bloom said to send him the contract and he would sign it. The written contract proposed by Lissner was exactly as Lytton had described. Upon examination Bloom signed Lissner's Contract No. 3897 agreeing to sell 20 tons of Unburnt No. 1 Scrap.

The contract was a brief one page document comparable to a contract on an order form. The terms relating to price were typed in as follows:

(a) "TERMS: 75% provisionally advanced upon receipt of material. Balance within 30 days after pricing."

(b) "PRICE: The price to be mutually agreed upon between buyer and seller, whenever seller wishes to price this contract."

(c) "MATERIAL TO BE PRICED DURING COMEX TRADING HOURS."

The new contracts employed by Lissner's were not unique in the respect that pricing took place on a date different from the making of the contract. Other contracts were in effect in which, according to the express terms of the contract, the pricing was to occur within a stated number of days, usually between 30 and 90. What was unique about these new contracts was that they gave the seller the right to have pricing agreed upon "whenever seller wishes to price this contract."

While these contracts are somewhat circumspect, the manner in which they would function was in large part clearly understood by both sides and not subject to dispute. It was anticipated that on a date chosen by the seller for pricing, the seller could call Lissner and ascertain Lissner's current price for scrap. If that price was agreeable to the seller, it would be applied to the open price contract, and the contract would be closed out. If the seller disagreed it would remain open until another day of the seller's choosing.

The aspect which is in dispute in this litigation is whether the term "whenever" literally meant whenever the seller wished to price or whether, as Lissner contends, there was an implied limitation which allowed the seller only a period of two or three months within which to exercise his right to select a pricing date. I have found no credible evidence supporting Lissner's claim that any such limiting term was stated or implied.

Thereafter Lissner and Pepper's continued to make contracts for the sale of scrap on the same terms and understandings. Each was negotiated by Lytton for Lissner and Bloom for Pepper's. There is no dispute as to the tonnage or quality of copper

scrap delivered by Pepper's to Lissner under these contracts. Certain of them were closed out by mutually agreed pricing and are not in dispute.

The contracts of this nature (sometimes referred to in this opinion as "whenever" contracts) which are here in dispute between the parties are the following:

| Contract | Date | Inv. # | Inv. Date | Del. Date | Lbs. Rec. | Adv. |
|----------|------|--------|-----------|-----------|-----------|------|
| P–3897 | 6/1/76 | 336 | 6/14/76 | 7/13/76 | 41,025 | $21,800 |
| P–3966 | 6/15/76 | 342 | 6/28/76 | 7/15/76 | 40,657 | $21,700 |
| P–4022 | 7/1/76 | 345 | 7/16/76 | 8/3/76 | 39,895 | $20,400 |
| P–4022 | 7/1/76 | 354 | 8/6/76 | 8/20/76 | 39,971 | $20,400 |
| P–4224 | 9/1/76 | 363 | 9/7/76 | 10/1/76 | 40,260 | $18,300 |

Lissner also made numerous similar contracts with other scrap sellers during 1975 and 1976.

The theories, plans and expectations which lay behind Lissner's adoption of the "whenever" contracts were, roughly stated, as follows. Upon receipt of the scrap in question Lissner promptly sold it at current prices either after refining it or in unrefined form. Lissner believed, as many did at the time, that copper prices were unreasonably low and would rise in time. Having sold at fixed prices, Lissner was exposed to the risk of losses as future copper price increases would cause Lissner's purchase price under the open contracts to increase. To protect itself against the risk of future price increases, Lissner hedged by buying copper futures contracts for quantities equivalent to the open unpriced "whenever" contracts for scrap. Thus, when market increases would lead the sellers to price out their "whenever" contracts, Lissner would simultaneously close out the matching hedges. The losses anticipated by Lissner's in the scrap contracts would be offset by gains it would realize from its copper futures contracts.

There is, however, in the copper futures markets a pricing consideration known as "contango." This word, of cockney origin, refers to the premium which, in conditions of oversupply or glut, a seller may demand of a buyer in compensation for delay in delivery. It is a kind of storage charge which is exacted by sellers in periods of glut against buyers who contract for future, rather than for immediate, delivery. It reflects the fact that during the time until delivery is made the seller will be burdened with warehousing costs and other carrying charges. Conditions of oversupply having been common in the recent history of the copper market, contango costs have commonly been assessed against purchasers of future delivery contracts. Those conditions existed in late 1975 and 1976 when Lissner was hedging its "whenever" scrap contracts by the purchase of copper futures. As a result, Lissner incurred contango costs incident to its purchase of futures for hedging purposes.

Steinfeld and Lissner were well aware of contango costs when the "whenever" contract strategy was devised. Steinfeld recognized that contango costs would result from the purchase of hedges and would accumulate for every month that the "whenever" contracts remained open. However, according to his analysis, the contango expenses would be offset by other factors.

The first of these was an expectation of profit on the "scrap discount". Scrap prices are set by reference to the market prices for refined copper. Refined copper prices are posted, based upon trades on the Commodities Exchange ("COMEX"), on a present, or "spot", basis, as well as on the basis of future delivery. The market price of scrap is generally less than the COMEX market price of refined copper, the difference between the COMEX copper price and the price of copper scrap constituting the "scrap discount". The discount is variable. It reflects the cost of refining the scrap to convert it into finished copper, as well as a great variety of other factors which inevitably affect a free commodity market. According to Steinfeld's experience and belief, as the prices of refined copper increase on

the world markets, scrap prices will increase at a slower rate. Put in other words, the "scrap discount" increases in periods of rapidly rising copper prices. Lissner's eventual settlement with the scrap sellers would be based on the scrap discount prevailing at the time of closing, while its profit on its hedging contract would bring it the full increase in COMEX refined copper prices. The scrap discounts prevailing in 1975 and 1976 when the "whenever" contracts were entered into varied between 1½ and 3 cents per pound. Steinfeld believed that rising copper prices would result in an increase in scrap discounts to as much as 10 cents per pound. Thus, according to Steinfeld's calculations, this phenomenon would give Lissner a considerable cushion against the accumulating contango costs.

The second factor on which Lissner relied to offset contango costs was the free use of money in the intervening period. The whenever contracts required Lissner to pay to the sellers a provisional advance of 75% of the value of the copper at the time of delivery. Lissner promptly resold this copper at 100% of prevailing prices. Lissner would retain the free use of the 25% difference until the closeout. In addition, the traditions of the market were such that Lissner would not be expected to make its final payment to the sellers until 30 days following the agreed pricing.

Had the copper market come back reasonably promptly, everything might have worked out well for Lissner. However, copper prices went down instead of up and stayed down for many months. During all of this period of time contango costs cumulated on the future positions which Lissner was holding as a protective hedge against the open whenever contracts. Their impact became considerable.

From time to time in late 1976 and early 1977 Lissner's traders called Pepper's and other sellers to urge them to close out the "whenever" contracts. However, as prices were generally unfavorable to the sellers, most of them refused to do so. A few contracts were either closed out by the sellers or renegotiated under new agreements.

In early 1977 Lissner's bankers began to have doubts about its financial stability. Bankers can be persuasive in such circumstances. Lissner's bankers persuaded Lissner to engage the services of Michael J. Tully to evaluate its continued viability. Tully studied the situation and concluded that Lissner was being strangled by the contango costs incident to the hedging of the whenever contracts.

As a result of Tully's analysis, Lissner's executives in conference with him in May of 1977 devised a new strategy of reinterpreting its "whenever" contracts. The principal reinterpretations involved the assertion of an implied limitation of two to three months on the sellers open right to price. The second was the assertion of an implied obligation on the sellers to bear all contango costs which Lissner had incurred on its hedges throughout the life of the contracts.

On June 14, 1977 Lissner sent to Pepper's and to its other scrap sellers under open whenever contracts a letter (PX 30) in which it stated,

> The contract was entered into *with the expectation that it be priced within two to three months.* A substantially greater period of time has elapsed and as of this date you have not yet elected to fix the price for your material. The time already expired is unreasonably long and it is now incumbent upon you to select a time in which the price for your material will be fixed. We propose that the price be fixed by mutual consent between us prior to June 24, 1977. We will pay you for your material at that agreed price *less total contango costs incurred* between the date of delivery of your material and the date price is fixed. (emphasis supplied)

The letter went on to state that if the scrap dealer did not come to such an agreement voluntarily, Lissner would unilaterally close the position out on June 24, and would settle with the scrap dealer on a basis which charged him with all of Lissner's contango costs incurred to the closing date.

Since the prices in effect in June, 1977 were below the prices which prevailed when Pepper's had sold to Lissner under the open contracts, the proposals contained in the June 14, 1977 letter would have involved losses for Pepper's.

In alarm, Bloom called Glenn Lytton but was unable to reach him. He then called Jeffrey Farber, the treasurer of Lissner and the signatory of the letter. Bloom protested vehemently to Farber that the letter was not in accordance with his contracts. Bloom then called Robert Joblove, the president of Lissner, and made similar protests.

On August 10, 1977 Lissner sent a telegram to Pepper's (PX 31). The telegram stated, "pursuant to our letter of June 14, 1977 re open price scrap purchase contracts between us, we shall sell at market on August 11, 1977 COMEX copper contracts held by us on account of your open price contracts. STOP." The telegram went on to acknowledge Pepper's protest and to suggest that Pepper's purchase future contracts covering an equivalent quantity of COMEX copper and thereby maintain an open price position. Bloom again called Joblove and protested vehemently.

On August 11, 1977, Joblove sent Pepper's a letter advising "that we have today priced the following contracts as per our letter dated July 14, 1977." The letter went on to specify the five deliveries made by Pepper's to Lissner under the four open whenever contracts and to specify a price for each delivery. The prices ranged from 42.90 cents per pound to 45.90 cents per pound. These prices were explained in an accompanying schedule which showed that each of the contracts had been priced by Lissner at 53.20 cents per pound and that this price had been reduced by a charge of ½ cent per pound per month since the making of the contract for contango costs. Thus, for the contracts which had been open 13 months, the price being paid by Lissner to Pepper's was reduced by 6.50 cents per pound, and the contract which had been open 10 months reflected a price reduction of 5 cents per pound. The scrap discount adopted by Lissner for purposes of this pricing was in each case the same scrap discount as had been used to calculate the amount of the provisional advance on the date of delivery of the copper scrap. The prices which prevailed at the times of delivery upon which the provisional advances were based had been considerably higher. Thus, according to Lissner's unilateral close out, the 75% provisional advances exceeded the purchase prices. Accordingly, the letter concluded by asserting a balance due from Pepper's to Lissner of $13,456.69 and demanded payment within 30 days. (PX 32)

Bloom again called Joblove in protest. Bloom refused to have his positions priced as of August 11, 1977 and told Joblove that Lissner had no right to do this to him. In an attempt to compromise the dispute, Bloom suggested to Joblove that the contracts be priced on the basis of the prices which had prevailed on the dates of delivery. Joblove answered he could not agree to such pricing and that the matter was out of his control. Pepper's did not pay the $13,456.69 which Lissner charged it in the settlement report of August 11 and made its protest perfectly clear.

During the two months following the June 14 letter, Bloom, feeling that he was largely at the mercy of Lissner in this matter, attempted to maintain open relations. Accordingly, Pepper's made two additional sales of scrap to Lissner and, in one instance, paid a small bill involving transportation costs. But in no instance did Pepper's accept Lissner's rendition of the account, either by word, deed or implication. The additional purchases by Lissner from Pepper's are a part of this litigation, together with a May purchase, because Lissner has not paid for them. These contracts are referred to by the parties as the "First Claim Contracts". Lissner's obligation to pay Pepper in full for the First Claim Contracts is not disputed. The amounts due are involved in the ultimate computation of an accounting between the parties.

On or about October 27, 1977, Bloom met with Mort Lissner, one of the owners of Lissner, at a trade convention in New Orle-

ans. Bloom told Mort Lissner that he objected to the actions taken by Lissner in connection with the whenever contracts and explained the situation. Mort Lissner, who was not familiar with this aspect of Lissner's business, said he would look into it when he returned to Chicago. The conversation was brief and is of significance only in that it represents a part of Bloom's continuous and repeated protest to the Lissner action.

On or about November 2, 1977, Lissner sent a remittance advice (PX 34) showing a net balance due to Pepper's of $889.94. This amount was arrived at by balancing the amounts due from Lissner to Pepper's under the First Claim Contracts as against the $13,456.69 which Lissner claimed was owed by Pepper's in connection with the whenever contracts. This statement of account was accompanied by Lissner's check in the amount of $889.94 in Pepper's favor.

Upon receipt of this advice and check, Bloom again called Lissner and repeated all of his protests. He first called Farber who told him that nothing could be done. Bloom then called Mort Lissner and repeated all of his objections and protests. Mort Lissner told Bloom that he could do nothing. Pepper's did not cash, deposit, certify or otherwise indicate acceptance of Lissner's check for $889.94.

After Bloom's unsuccessful conversation with Mort Lissner, Pepper's retained attorneys. The check for $889.94 was turned over to the attorneys, who held the check and offered during the course of trial to return it to Lissner, at which time Lissner refused.

Pepper's never in any way suggested to Lissner that it would accept Lissner's accounting or the benefits of Lissner's check. To the contrary, since the June 14, 1977 letter, Pepper's consistently and vehemently protested and insisted on Pepper's rights under the "whenever" contracts.

## CONCLUSIONS OF LAW AS TO LIABILITY

▇ Lissner urges the court to make findings construing the "whenever" con-

tracts in accordance with the position taken in Lissner's communications of June and August of 1977, that is, as containing an implied two-to-three month outer limit for pricing and requiring the seller to bear the contango costs incident to the buyer's hedging contracts. I find no credible support for this construction in the record. It is not consistent with the express terms written on the face of the contract; it is not consistent with the conversations between Lytton and Bloom which accompanied the making of the contracts. It was not Pepper's understanding. Nor was it Lissner's understanding at the time the contracts were made.

The "whenever" provision was the most significant term of these contracts and was the focus of the parties' primary attention during the negotiations. This term was expressly designed by Lissner to overcome Pepper's reluctance to sell at the depressed prices of the time. Lissner representatives clearly represented to Pepper's that the contracts would remain open for pricing until whenever Pepper's chose. Lissner's vice president and buyers had authority both real and apparent to enter into such contracts. It was clear, furthermore, that Lissner personnel had clearly understood and given careful consideration to the ramifications of this unusual provision. Lissner's top management had seen the contracts and had been briefed on them by Steinfeld. It is significant that both Lytton and Steinfeld testified in full support of Pepper's contentions. Lissner's attempts to impeach them on the grounds that they were no longer in Lissner's employ were totally unpersuasive.

The most that can be said on Lissner's side of the argument is that many believed copper prices would improve faster than they did. But in no way was this expectation incorporated as a basis, a premise or a limitation of the whenever contracts.

There was no credible evidence suggesting that Lissner's senior personnel ever believed prior to May 1977 that Lissner had any contractual right to require Pepper's to

close out within three months. Indeed, the proof was to the contrary: From late 1976 through Tully's arrival in May of 1977, Lissner was taking a beating from its monthly accumulating contango costs. Lissner's traders made repeated calls to Pepper's and other "whenever" sellers urging them to close out the contracts. But never prior to June, 1977 did anyone at Lissner suggest to any seller that the time for open pricing had expired. The behavior of Lissner's management and its traders throughout this period was altogether consistent with Pepper's construction of the contracts, and shows that they acknowledged Pepper's right to hold the contracts open.

Lissner further argues that the customs and usages of the copper trading markets required any participant in such negotiations to understand that a limit of two to three months was implied. Lissner did not succeed in proving any such thing. It relied primarily on Tully's testimony to the effect that open pricing contracts were customary in the copper industry but only with a duration of two or three months maximum and that the industry had no familiarity with contracts with any longer open duration. Accepting Tully's testimony at face value, it would not establish what Lissner seeks to draw from it. For it is absolutely clear that Lissner conceived the "whenever" contracts, and presented them to Pepper's, as being new and different, as embodying an approach which was a radical departure from the previously familiar contracting forms. The contracts were designed in this fashion precisely because the scrap sellers were not interested in selling on terms that called for immediate or near term pricing. Lytton told Bloom that Lissner was buying under a "new kind" of contract. In the face of this evidence, it is illogical to contend that Bloom should have understood the contracts to be of the old familiar kind. More importantly, Bloom was told, both orally and on the face of the agreements, that the seller would be entitled to price "whenever [it] wishes to . . . ."

■ I need not decide whether the whenever term was absolute, or implied some obligation on Pepper's not to extend the contracts for an unreasonable time or in unreasonable circumstances; for, on these facts, I find that the holding open through August 1977 was entirely reasonable and within the contemplation of the contracts.

The evidence contained absolutely no support for Lissner's contention that the sellers were required under the contracts to bear Lissner's contango costs. Nothing of the kind was written in the contracts or ever mentioned in the negotiations. Furthermore, it would have represented a complete departure from the patterns of dealing which existed between the contracting parties previously. Where Pepper's had previously sold to Lissner under contracts which called for pricing delays, it was never a term of such contracts that Pepper's would carry contango costs incurred by Lissner during the delay before pricing.

Nor, contrary to Lissner's contentions, is there any reason to believe that Pepper's was aware that Lissner would incur such contango costs. Pepper's and Lissner were engaged in quite different businesses. Pepper's was simply an accumulator, processor and seller of scrap. Lissner was engaged in a different and far more sophisticated financial business. The conventional business of Pepper's, unlike Lissner, did not involve COMEX dealings in copper futures or other forms of hedging. Lissner argues that Pepper's must have known that Lissner was hedging its contracts with COMEX futures and furthermore that such hedging must have entailed contango costs. But those were Lissner's concerns, not Pepper's. There is nothing to suggest that Pepper's had any familiarity with Lissner's hedging procedures or that such thoughts had ever entered Bloom's mind.

I find in summary that none of Lissner's contentions as to time limitations or the shifting of the contango costs are supported by the evidence. The proof was all to the contrary and supported Pepper's contentions.

■ Next, Lissner contends that if the contracts are construed as I have found they were intended to be, then these con-

tracts are so unfair and one-sided as to be unenforceable. Lissner argues that all the benefits go to the seller while the burdens, costs and all of the risk are heaped on the buyer. I find that this contention misstates the realities. The contracts, as I construe them, contain benefits and risks for both sides. The principal benefit which they contained for Lissner, the buyer, was the immediate delivery to it of scrap copper which was otherwise unavailable. A second benefit was that Lissner retained 25% of the value of that scrap interest-free until final settlement. Absent considerations not present here, such as conditions of "adhesion", unequal bargaining power, or deceitfulness in negotiation, the benefits just enumerated are sufficient to dispel any notion that the contracts were void for want of mutuality, or otherwise require reformation. *See Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978) (disparate bargaining power); *Friedman v. Egon*, 64 A.D.2d 70, 407 N.Y.S.2d 999 (1978) (disparate consideration); *Friedman, supra,* (unfair negotiations); *Uniform Commercial Code* § 2–302. There is, accordingly, no need for me to decide the precise limits of a third benefit to Lissner, to wit—the risk that price movements in copper could work to Lissner's benefit. At the very least, if copper prices went into a permanent decline (whether as a result of changes in technology, changes in money conditions, or whatever), Lissner would have acquired the copper at only 75% of its value on the date of acquisition. It is an arguable construction of these contracts that the provisional advance clause required that in changing price conditions the advance be adjusted to 75% of current values. If this were so, these contracts might have resulted in Lissner acquiring the scrap at very substantially cheaper prices if the market declined. The contracts are particularly circumspect as to whether any obligation existed to maintain the "provisional" advance at 75% of current values. Nor was there evidence of any discussion on this point. Since the resolution of that point is unnecessary to the dispute before me, I refrain from suggesting a finding either

way. But I conclude that Lissner has failed to demonstrate that as a matter of law the contracts are void for want of mutuality unless construed in accordance with Lissner's suggested interpretation.

Finally, Lissner argues that, under the principles either of account stated and taken or of accord and satisfaction, the August 11 and November 2, 1977 accountings accompanied by Lissner's check for $889.94 was accepted by Pepper's as the final resolution of the dispute.

■ An account stated and taken is an agreement, express or implied, that an examination of the accounts as between respective parties has taken place and that a statement of the account has been asserted and accepted as correct. *See, e. g., Parker, Chapin, Flattau & Klimpl v. Daelen Corp.*, 59 A.D.2d 375, 399 N.Y.S.2d 222 (1977); *Frucht v. Garcia*, 44 Misc.2d 52, 252 N.Y.S.2d 825 (1964). *See generally Williston on Contracts* §§ 1862, 1863 (1979). A party receiving an accounting by another party is, under some circumstances, obliged to examine the account. Resolution whether or not such communication results in a binding agreement regarding the parties' respective positions requires the court to consider the circumstances surrounding the accounting and the parties' manifestations of intent. *See e. g., Interman Indus. Products, Ltd. v. R.S.M. Electron Power, Inc.*, 37 N.Y.2d 151, 371 N.Y.S.2d 675, 332 N.E.2d 859 (1975); *Simmons v. Santoro*, 36 Misc.2d 409, 232 N.Y.S.2d 602 (1962). *See generally Williston, supra,* at § 1863.

■ An accord and satisfaction is a form of contract whereby one party agrees to give or perform, and the other party agrees to accept, what is offered in settlement of an outstanding claim. When this contract, or accord, is executed, the claim is satisfied. *See e. g., McMahon v. Pfister*, 39 A.D.2d 691, 332 N.Y.S.2d 591 (1972). *See generally A. Corbin, Contracts* § 1276. In appropriate instances, the acceptance by one party of benefits offered in settlement by the other will give rise to an inference that the differences have been settled by

the proffered agreement. *See e. g., Welbourne & Purdy, Inc. v. Mahon,* 54 A.D.2d 1046, 338 N.Y.S.2d 369 (1976). Again, the resolution whether or not there was the meeting of the minds necessary to create the accord requires the court to examine the circumstances surrounding the putative contract, including the parties' expressions of intent. *See e. g., Werking v. Amity Estates, Inc.,* 2 N.Y.2d 43, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956). *See generally A. Corbin, supra,* at § 1277.

■ Lissner has failed to prove that Pepper's agreed to Lissner's account of the claims between the parties. Pepper's constantly, repeatedly, and vehemently disputed Lissner's proffered accounts. Pepper's cannot conceivably be found to have assented to the account as stated by Lissner. *See, e. g., James Talcott, Inc. v. United States Tel. Co.,* 52 A.D.2d 197, 383 N.Y.S.2d 39, 41 (1976) (evidence of account stated subject to refutation by proof of timely oral protest).

■ Lissner likewise has failed to prove an accord and satisfaction. Pepper's timely and vigorous oral protests after receiving the November 2, 1977 accounting and check undercuts any assertion that there was a meeting of the minds over the parties' claims. Moreover, the circumstances reinforce this evidence that Pepper's did not assent to Lissner's payment of $889.94 in settlement of Pepper's claims. For, Lissner had never disputed that $889.94 was owed Pepper's; Lissner's payment of this sum involved no compromise at all. *See Williston, supra* at § 1851.

■ Nor does the fact that Pepper's entered into First Claim contracts after Pepper's receipt of the June 14, 1977 letter overcome the evidence of an ongoing dispute. The principles of accord and satisfaction do not require a disputant to cease all commerce with his adversary in order to preserve his right of action. *See Werking v. Amity Estates, Inc., supra,* 2 N.Y.2d at 51, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956) (accord requires manifestation of intent to accept new promise, or arrangement, in satisfaction of specific past obligation); *cf.*

U.C.C. § 1–207 (acceptance of check with notation of protest preserves claims against drawer).

■ Finally, there was no satisfaction. The November 2 check was neither cashed nor certified; nor did Pepper's exercise dominion over the funds in any way. *See, e. g., Lange-Finn Const. Co. v. Albany Steel & Iron Co.,* 94 Misc.2d 15, 403 N.Y.S.2d 1012, 1014 (1978); *A. Corbin, supra,* at § 1279.

No legal conclusion follows from the fact that Bloom's protests were not in written form. *See James Talcott, Inc. v. United States Tel. Co., supra.* The scrap dealer, being more a man of parts than a man of letters, made his protests orally. I have no doubt that his words were well chosen to convey his meaning.

Plaintiff has sustained its burden of proving defendant's breach of the whenever contracts. There remains to consider the measure of damages to which plaintiff is entitled.

So ordered.

## MEMORANDUM ORDER

LEVAL, District Judge.

### On Damages

The defendant contends that the correct measure of damages owed by Lissner on the Second Claim Contracts is the cost plaintiff would have incurred in purchasing copper future contracts on the date of the breach and in maintaining the positions until the pricing date. The defendant contends that the contango costs represent the cost (though not the *value*) of what the plaintiff lost as a result of the defendant's breach: the opportunity to speculate on a future rise in copper prices. Had the plaintiff purchased copper futures immediately upon being notified of the defendant's breach, the defendant contends that the plaintiff would have been restored to the position it enjoyed prior to the breach, except to the extent that the contango costs of the futures would be paid by the plaintiff rather than by the defendant.

■ I do not agree with this contention. First, New York's Uniform Commercial Code (hereinafter cited by section) does not impose upon a seller which has fully performed its obligations under a contract and delivered goods accepted by the buyer a duty to cover upon learning of the buyer's breach. Instead, § 2–709 provides for an action for the price of the goods. Even assuming that the general obligation to proceed in good faith, *see, e. g.,* § 1–203, required the plaintiff to undertake reasonable efforts to mitigate the damages occasioned by the defendant's breach, I do not find that the defendant has met its burden of proving, *see Cornell v. T. V. Development Corp.,* 17 N.Y.2d 69, 268 N.Y.S.2d 29, 215 N.E.2d 349 (1966), that this plaintiff can reasonably be expected to have invested in copper futures to protect its or the defendant's exposure. Unlike defendant, a sophisticated financial company, fully acquainted with the complexities of metals futures markets, plaintiff was a scrap dealer; it had little or no familiarity with COMEX dealings in copper futures or with hedging.

Furthermore, unlike a disappointed seller still in possession of his goods who can mitigate damages simply by disposing of them in the market or a disappointed buyer who expected to purchase goods and can mitigate by simply turning elsewhere, this plaintiff had parted with its goods in expectation of receiving his price upon election of a pricing date. There was no way for plaintiff to cover or reconstitute its position in the copper market without resort to transactions of a type completely unfamiliar to plaintiff. Nor was there evidence that the plaintiff had the resources available to purchase copper futures. *Compare Jackson, Anticipatory Repudiation and the Temporal Element of Contract Law: An Economic Inquiry into Contract Damages in Cases of Prospective Nonperformance,* 31 Stan.L.Rev. 69, 94. *See generally Williston on Contracts* § 1353 (1960).

I therefore reject as unfair and inappropriate the measure of damages proposed by defendant.

Section 2–709 provides that the plaintiff is entitled to "the price." It remains to determine what the price of the undelivered copper scrap was.

The *whenever* contracts were a form of open price term contracts. It was anticipated that pricing would occur as follows: from time to time plaintiff would check Lissner as to its price quotation for copper scrap. At any given time during COMEX hours, Lissner's scrap price would be based on the COMEX price for refined copper, modified by Lissner's scrap discount. When the price was acceptable to plaintiff, plaintiff would designate the day as the pricing date for specified contracts. Lissner specified that the pricing would take place during COMEX hours, so as to permit it simultaneously to close out its hedges.

Section 2–305 provides for open price term contracts in the following terms:

(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

It does not appear that the whenever contracts fall neatly within any of the categories of § 2–305. Subsection 1(a) is clearly inapplicable, as the parties addressed the question of price. Subsections 1(b) and (c) are clearly not appropriate: among other reasons, they provide for setting the price by reference to the time of delivery; the very purpose of the whenever contracts was to discard the time of delivery as the reference point and substitute the date chosen by plaintiff. Use of Section 1(b) or (c) would therefore deprive the injured plaintiff of the value of his agreement.

Nor is subsection 4 applicable. The contracts were intended to be binding from the first. Nor does subsection 2 describe the contracts or provide helpful guidance.

Subsection 3 comes closest to describing the whenever contracts. In a sense, the whenever contracts were to be priced "otherwise than by agreement of the parties", although agreement was to play a role in the pricing process. Plaintiff upon verifying the prices being quoted by defendant as a market maker had the power to fix the price at Lissner's quotations by designating the date. Subsection 3 directs in such circumstances that the plaintiff can treat the contract as cancelled (an option obviously rejected here) or can fix a *reasonable* price. In the context, the fixing of a reasonable price means the fixing of a reasonable market price on a date reasonably within the contemplation of the parties' agreement.

■ The contemplation of these contracts was to the effect that plaintiff would hold the price open until the market advanced to a point which would provide plaintiff with a reasonable profit on the scrap previously delivered to defendant. It was entirely within this contemplation that the contracts would remain open if, as proved the case, the prices remained substantially below the market on the delivery date until January 1978. Without deciding whether it was within the parties' reasonable understanding that Pepper's could have held the whenever contracts open indefinitely or significantly beyond January 1979, I find that pricing in the period January 1979 through March 1, 1979 [1] (the pricing date requested by the plaintiff) would be consistent with the understanding and intentions of the parties.[2]

The lowest and highest copper spot prices as established by the COMEX, see PX 22, for the period January 1–March 1, 1979 were respectively 68.45 cents per pound and 93.90 cents per pound. The mean COMEX price for the period was 81.18 cents per pound.

Recognizing that there is considerable arbitrariness in reaching such a solution, I conclude that this mean represents a fair basis for the damage award. It presupposes a rough scenario to the effect that plaintiff might have waited until prices returned to a break even level and might thereafter have closed out his various contracts from time to time achieving a net result not far from the mean described above.

The COMEX spot price must be reduced to allow for the scrap discount. There was evidence that the scrap discount generally varied from 1.5 to 3 cents per pound, and that the discount would tend to increase with the spot price of refined copper. There was also evidence to suggest that the scrap discount was as high as 3.8 cents, when the COMEX price was at 76.3 cents per pound. See PX 32. A scrap price of 77.38 cents per pound reflecting the impact of a 3.8 cent discount on a spot price of 81.18 cents per pound appears to represent a reasonable resolution of these contracts.

1. The fact that the plaintiff contended in its complaint dated June 22, 1978 that the whenever contracts should be priced as of that date is of little consequence. Plaintiff was not obliged to withhold service of its complaint until a reasonable pricing date arrived. Nor does the defendant contend that it was prejudiced in any way by the position taken in the plaintiff's original complaint.

2. An alternate mode of analysis reaching the same result would be to reason that subsection 1(c) governs, with the understanding that the parties by contract had agreed to substitute the "time of plaintiff's choice" for the time of delivery. The court would then determine in accordance with the contract what was the price on a date reasonably deemed to be the date chosen by plaintiff for pricing.

The amounts owed based on these assumptions are as follows:

| Contract | Lbs. Received | (X) 77.38 | Contract Amount |
|----------|---------------|-----------|-----------------|
| P–3897 | 41,025 | " | $31,745.15 |
| P–3966 | 40,657 | " | $31,460.39 |
| P–4022 | 39,895 | " | $30,870.75 |
| P–4022 | 39,971 | " | $30,929.56 |
| P–4224 | 40,260 | " | $31,153.19 |
| | | | Total $ 156,159.04 |

Subtracting the amount provisionally advanced by the defendants, $102,600.00 from this last figure, I find that the amount due from Lissner to Pepper's on the Second Claim Contracts is $53,559.04. Thus, Pepper's total damages with respect to the Second Claim Contracts based upon this figure, and taking into account interest at 6% per annum, see N.Y.C.P.L.R. § 5004 (1978) (applied to the period from February 1, 1979, the median date of the reasonable pricing period, to date, or 1.33 years × .06 × $53,559.04 = $4,274.01 interest), amounts to $57,883.05.

The amount owing under the First Claim Contracts as agreed by the parties was $14,-346.03 as of Aug. 11, 1977. (PX 34) Taking into account interest at 6% per annum (applied to the period from Aug. 11, 1977, the date when the First Claim Contracts were closed out, to date, or 2.75 years × .06 × $14,346.63 = $2,367.19, the total amount owing under the First Claim Contracts is $16,713.82.

Judgment shall be entered for the sum of the amounts owing under the two sets of contracts, or $74,596.87

So ordered.