**FIRST SECURITY MORTGAGE COMPANY, Plaintiff,**

v.

**GOLDMARK PLASTICS COMPOUNDS, INC., Defendant.**

No. CV 91–3958 (ADS).

United States District Court, E.D. New York.

Sept. 20, 1994.

Ray, Quinney & Nebeker, Salt Lake City, UT, (John P. Harrington, Rich P. Hoggard, of counsel), for plaintiff.

Leonard B. Austin, P.C., Huntington Station, NY, (Leonard B. Austin, Andrea Seychett Schear, of counsel), for defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

Although the plaintiff First Security Mortgage Company ("plaintiff" or "First Security") is the nominal party bringing this lawsuit, in essence this case is a dispute concerning the amount of a setoff to the defendant with regard to its claims of breach of warranty in connection with the sale of certain plastic product. The two companies involved are Goodson Polymers, Inc. ("Goodson"), a Utah corporation, the manufacturer and seller, and the defendant Goldmark Plastics Compounds, Inc., ("defendant" or "Goldmark") the buyer of the polystyrene plastic.

## I. UNCONTESTED FACTS AND PRE-TRIAL STIPULATIONS

Many of the facts in this case are not disputed. Among the uncontested facts as set forth in Schedule C of the pre-trial order are the following:

1. The plaintiff First Security is a Utah corporation with its principal place of business in Salt Lake County, State of Utah.

2. First Security is the successor-in-interest of the claims asserted in this action by Goodson against Goldmark for plastic goods sold and delivered, by means of an assignment dated June 13, 1991, from First Security Bank of Utah, N.A. ("FSB") to First Security.

3. Goodson is a Utah corporation that had its principal place of business in Salt Lake City, Utah and was in the business of manufacturing polystyrene.

### The Goodson–FSB Loan Relationship

4. On or about November 22, 1988, Goodson executed a Revolving Commercial Credit Note in favor of FSB in the amount of $6,000,000.00.

5. On or about May 1, 1989, but effective as of November 22, 1988, Goodson executed an Amended and Restated Term Commercial Credit Note in favor of FSB in the principal amount of $9,500,000.00.

6. On or about November 22, 1988, Goodson executed a Security Agreement covering receivables, inventory and equipment in favor of FSB. Pursuant to the provisions of the Security Agreement, Goodson granted to FSB a security interest in all of its accounts receivable and other rights to payment along with all proceeds therefrom to secure the repayment of all obligations owed by Goodson to FSB.

7. Goodson defaulted on its repayment obligations to FSB. Based on the default, FSB obtained a judgment against Goodson in the amount of $11,484,475.98.

### Goodson–Goldmark Relationship

#### (Unpaid Shipments)

8. Defendant Goldmark is a broker of general purpose polystyrene. As a broker, Goldmark purchased polystyrene from manufacturers such as Goodson, and then resold the polystyrene to end-users.

9. From March 1990 to July 1990, Goodson sold and delivered to Goldmark, and Goldmark accepted shipments of general purpose polystyrene under the following invoices ("Invoices") at issue in this litigation:

| Goodson Invoice Date | Goodson Invoice Number | Amount |
|---|---|---|
| March 23, 1990 | 9426, 9426–C | $ 19,138.40 |
| April 16, 1990 | 9481 | $ 79,350.00 |
| April 20, 1990 | 9491 | $ 21,012.80 |
| June 8, 1990 | 9409–A | $ 124.20 |
| June 8, 1990 | 9557 | $ 77,787.00 |
| June 8, 1990 | 9558–A | $ 78,002.00 |
| June 20, 1990 | 9565 | $ 17,640.00 |
| June 20, 1990 | 9566 | $ 17,016.00 |
| June 25, 1990 | 9568 | $ 17,974.00 |
| July 16, 1990 | 9570 | $ 14,458.56 |
| | TOTAL | $342,502.96 |

10. Goldmark has not paid for the shipments represented by the Invoices with the exception of one payment in the amount of $20,160.00 dated August 1, 1990 made by Maryland Plastics, Inc. for and on behalf of Goldmark. Therefore, the total amount due and owing on the Invoices is $322,342.96, subject to alleged setoffs in favor of Goldmark. The amount of these setoffs is the principal issue in this case.

11. Goodson, FSB and First Security have made demand on Goldmark to pay $322,342.96 as reflected in the Invoices, less the Maryland Plastics Payment, but Goldmark has not made any such payment.

*(Breach of Warranty Claims)*

*1988 Complaint*

12. Goodson made the following shipment to Goldmark for which Goldmark contends it has an unresolved claim against Goodson because of a complaint from an end-user in 1988 due to allegedly defective polystyrene ("1988 Complaint Shipment"):

| Goodson Invoice Date | Goodson Invoice No. | Alleged Complainant |
|---|---|---|
| September 30, 1988 | 7362 | Electra Poly |

13. In December 1988, Goldmark and Goodson negotiated the following adjustment to the purchase price on the 1988 Complaint Shipment:

| Goodson Invoice | Orig. Price ($/lb) | Adjusted Price ($/lb) |
|---|---|---|
| 7362 | 0.58 | 0.52 |

*1989 Complaints*

14. Goodson made the following shipments to Goldmark for which Goldmark contends that it has an unresolved claim against Goodson because of complaints from end-users during 1989 due to allegedly defective polystyrene ("1989 Complaint Shipments"):

| Goodson Invoice Date | Goodson Invoice No. | Alleged Complainant |
|---|---|---|
| December 9, 1988 | 7495 | Hanover Plastics Molding Indus. |
| February 3, 1989 | 7615 | Standard Polymers |
| May 31, 1989 | 7898 | Valiant Plastics |

15. In November 1989, Goldmark and Goodson negotiated the following adjustments to the purchase price on the 1989 Complaint Shipments:

| Goodson Invoice | Original Price ($/lb) | Adjusted Price ($/lb) |
|---|---|---|
| 7495 | 0.56 | 0.48 |
| 7615 | 0.55 | 0.49 |
| 7898 | 0.50 | 0.46 |

*1990 Complaint Shipment*

16. Goodson made the following shipment to Goldmark for which Goldmark contends it has an unresolved claims against Goodson because of a complaint by an end-user in 1990 allegedly due to defective polystyrene ("1990 Complaint Shipment"):

| Goodson Invoice Date | Goodson Invoice No. | Alleged Complainant |
|---|---|---|
| June 8, 1990 | 9557 | Atlan Plastics |

17. Goldmark issued the following debit memos to Goodson, dated June 19, 1990, purportedly for outstanding warranty claims on the 1988, 1989 and 1990 Complaint Shipments:

| Debit Memo No. | Goldmark Customer | Amount |
|---|---|---|
| 7199A | Atlan Plastics | $ 21,150.00 |
| 7199B | Standard Polymers | $148,196.00 |
| 7199C | Hanover Plastics } Molding Industries } | $ 64,158.41 |
|  | Valiant Plastics | $ 84,300.00 |
| 7199 E | Electra Poly | $ 70,200.00 |
|  | Total | $388,004.41 |

18. Goldmark also issued Debit Memo 7199F on June 19, 1990 in the sum of $24,300.00 purportedly for materials paid for but not delivered.

19. Goldmark's claimed setoffs total $412,304.41.

20. Prior to the negotiated adjustments for the 1988 and 1989 invoices, Goldmark had paid a portion of the 1988 invoice and all of the 1989 invoices.

Further, prior to the trial, the parties entered into a stipulation as to the plaintiff's pending motion for partial summary judgment. The parties agreed that plaintiff First Security has established its prima facie case on its claim for "action for the price" for $322,342.96 under Section 2–709 of the New York Uniform Commercial Code, subject to the Defendant's breach of warranty counterclaim or setoff defense. The parties further agreed that the trial of this matter shall be limited to litigation of the defendant's breach of warranty counterclaim and/or setoff defense. This stipulation eliminated the need for further consideration of the plaintiff's motion for partial summary judgment.

In addition, the parties agreed that the defendant's claim under Goodson Invoice 7655 is withdrawn as well as Defendant's Exhibit "G" in support of this claim.

Further, in another stipulation dated May 12, 1993, the parties agreed to the following facts:

1. Goldmark's claims against First Security for the alleged breach of warranty by Goodson shall be denominated as counterclaims, and shall consist of and be limited to the amounts listed on the following Goldmark debit memos:

| Number | Date | Amount |
|--------|------|--------|
| 71990B | 6/19/90 | $148,196.00 |
| 71990A | 6/19/90 | $ 21,150.00 |
| 71990C | 6/19/90 | $ 64,158.41 |
| 71990D | 6/19/90 | $ 84,300.00 |
| 71990E | 6/19/90 | $ 70,200.00 |
| 71990F | 6/19/90 | $ 24,300.00 |
| TOTAL | | $412,304.41 |

In addition to these debit memos, Goldmark's counterclaims shall also consist of the payment Goldmark allegedly made to Goodson on the shipment to Maryland Plastics.

2. First Security will assert the following affirmative defenses to Goldmark's counterclaims:

(i)   Accord and Satisfaction;

(ii)  Failure to Mitigate Damages;

(iii) Contractual Limitation on Damages;

(iv)  Failure to Give Timely Notice;

(v)   Contractual Disclaimer of Warranties; and

(vi)  Goldmark's Counterclaims may only be asserted as setoffs from its debt to First Security.

## II.  STATUS OF THE CASE PRIOR TO TRIAL

As a result of these stipulations, the parties have agreed that Goodson delivered and Goldmark accepted plastic product on which there is due the net sum of $322,342.96. There need be no trial as to this acknowledged debt.

The sole issue in this case is the amount, if any, of the setoff to be accorded to Goldmark on its breach of warranty counterclaims. Resolution of this issue also brings into play the defenses to the setoffs by First Security referred to above.

Goodson ceased manufacturing in May 1990. It had inventory on hand, some of which was sold to Goldmark. However, Goldmark made no payments for those shipments.

## III.  THE TRIAL

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (see also Colonial Exchange Ltd. Partnership v. Continental Casualty, 923 F.2d 257 [2d Cir.1991]). During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

The defendant Goldmark is a broker of a plastic product called polystyrene. Polystyrene products are in the form of small cubes or pellets, in spaghetti-like appearance. Goldmark purchased polystyrene from manufacturers such as Goodson and then resold the product to end-users. Goldmark purchases the plastic and either has it delivered to the end-users or it warehouses the product awaiting future sales. Goldmark is a distributor and upon purchase takes title to the plastic.

As stated above, and conceded by Goldmark, between March 1990 and July 1990, Goodson sold and delivered to Goldmark, and Goldmark received and accepted shipments of polystyrene under ten invoices totalling the sum of $342,502.96 of which the sum of $322,342.96 is unpaid.

Goldmark has refused to pay for these shipments because it claims that it is entitled to setoffs based on unresolved breach of warranty claims against Goodson with regard to certain prior shipments between 1988 and 1990 and one shipment which is included in the invoices involved in First Security's present claim. There are five invoices involved in Goldmark's setoff claim. In sum, these allegedly defective shipments, with one exception, all occurred prior to the shipments that are represented by the unpaid invoices for which First Security seeks recovery in this lawsuit.

The plaintiff points to a letter of confirmation it sent to Goodson on May 29, 1990, to buttress its position. This confirmation letter (Plaintiff's Exh. 24A) was completed, signed by Goodson employee Marie DeRose and returned to First Security, stating that $158,830.80 was due from Goldmark to Goodson, while nothing (typed 0.00, apparently by the sender) was due to Goldmark from Goodson (Plaintiff's Exh. 25). MARIE O'NEIL, formerly known as Marie DeRose, testified that she was an accounts payable clerk for Goldmark from October 1989 to April 1992. Ms. O'Neil stated that as an accounts payable clerk it was her duty to respond to confirmation letters as to accounts payable only. However, Ms. O'Neil testified that she did not indicate on the confirmation form what monies, if any, that Goodson owed to Goldmark, including any claim for defective

or returned product. In sum, in filling out this form, Ms. O'Neil did not intend to set forth the amount of any indebtedness or claim by Goldmark against Goodson, nor did she have the authority to do so.

With regard to the confirmation signed by Ms. O'Neil, Goldmark principal officer KENNETH GROSS testified that no clerk could speak for him, that all confirmations are sent to him and that O'Neil could not bind his corporation as to claims by Goldmark. Further, according to Gross, the figures in the bookkeeping system are inaccurate because the credits due to the defendant were not computed at that time. The Court credits this testimony. The Court finds that as of June 22, 1990, the records of Goldmark indicated that the sum of $158,830.80 was owed to Goodson. However, the Court finds that this same record, Plaintiff's Exh. 25, does not bind Goldmark as to whether there were any credits due to Goldmark or whether there were any claims pending against Goodson for defective product.

As to the procedure followed with regard to the sales by Goodson to Goldmark, Gross testified that all purchases are verbal. Goldmark keeps a log of the purchases it makes and the prices for such purchases, but does not issue formal purchase orders. Gross testified that Goldmark purchased plastic material from Goodson for a number of years. Goldmark established a payment practice of paying the Goodson invoices in "approximately 90 days." The procedure was that after the verbal order was placed by Goldmark and confirmed by Goodson, it would receive a fax copy of the bill of lading followed by a Goodson invoice.

With regard to the copy of the bill of lading faxed to Goldmark, Gross testified that they only received the front side and never received the back side, nor did Goldmark ever receive a hard copy of the bill of lading. When the invoice was received from Goodson it was stamped and entered. He would then approve the invoice and it would be held for payment. No invoice was paid without his approval.

Goldmark did issue certain "debit memos" to Goodson. A debit memo is a paper stating that Goodson owes Goldmark money because of certain claims, including defective merchandise. Although there is a custom and usage in the industry to issue debit memos to resolve claims, Gross stated that Goldmark did not normally use this procedure.

One debit memo arose from a complaint by Goldmark's customer Standard Polymers Corporation ("Standard"). On May 23, 1989 Standard wrote to Gross complaining that the material purchased from Goldmark "has been rejected by two of our customers" (Defendant's Exh. B1). The problem included "yellowing on the edges and breakage on approx. 70% of all parts." Annexed to this letter was a debit memo from Standard to Goldmark in the sum of $153,059.50.

The Court notes that Goodson invoice 7615, which is the delivery involving the Standard claim and is the invoice set forth in the Goldmark debit memo of June 19, 1990, was one of the invoices discussed and apparently resolved at a November, 1989 settlement conference.

In the Goodson memo made after the November, 1989 conference (Plaintiff's Exh. 14) it was stated:

"TO: NED GYLLENSKOG

FROM: DONALD V. SMITH

RE: RESOLVEMENT OF GOLDMARK COMPLAINTS

DATE: NOVEMBER 27, 1989

As you know, Dan Patrick and I met with Ken Gross of Goldmark and finally resolved the complaint hopper cars. In resolving the complaints, what I basically did was look at what we sold similar shipped and negotiated the price with Ken Gross accordingly.

. . . .

Outlined below are the cars involved; invoice numbers; dates; weights; etc., and the agreed upon resolved (adjusted) price.

. . . .

Invoice # 7615—194,500 lbs. shipped February 3, 1989, hopper car number UTLX 220168. Invoiced at $.55, adjusted to $.49.

Ned, please go ahead and credit the Goldmark account accordingly and make sure that the credit memo spells everything out in detail. Also, Ken Gross agreed to send

you a 'healthy' check as well. You should have it before you receive this memo."

In fact, Gross admitted that as to the Standard delivery, invoice 7615, Goldmark received a credit of six cents per pound at the November 1989 meeting (Tr. at 199). Strangely, Goldmark did not show this six cents credit in its debit memo (Defendant's Exh. B4). Gross testified that he "forgot to have them deduct the proper price" (Tr. at 302).

Attempting to explain the large sum of money Goldmark concededly owed to Goodson, Gross testified that to protect itself Goldmark "made sure that we ... were owing them a great deal of money."

The next account Gross reviewed was Valiant Plastics Corporation ("Valiant") represented by Goodson invoice 7898 dated May 31, 1989. According to Gross the problem with the Valiant delivery was that the material "was yellowing ... and there was excessive breakage." Valiant complained to Goldmark orally prior to October 1989 and by a letter dated October 22, 1989 (Defendant's Exh. C4). Goldmark issued a credit memo to Valiant including a product credit of $76,950.00 "minus other losses" in the sum of $16,800.00, the credit totalling the sum of $93,750.00 (Defendant's Exh. C5). On June 19, 1990 Goldmark issued a debit memo to Goodson involving the Valiant account in the sum of $84,300.00.

Gross testified that he told Goodson about the Valiant problem in 1989. The Court notes that the Valiant delivery dispute also was discussed and apparently resolved in the November 1989 meeting. The Goodson memo between Smith and Gyllenskog included the Valiant delivery dispute, Goodson invoice 7898, as follows:

"Invoice # 7898—188,00 lbs. shipped May 31, 1989, hopper car number GACX 73368. Invoiced at $.50, adjusted to $.46."

(Plaintiff's Exh. 14).

The next setoff claim involved Hanover Plastics Corporation ("Hanover"). The Hanover delivery is represented by Goodson invoice 7495, dated December 9, 1988, (Plaintiff's Exh. 21A). This invoice also included a delivery that went to another Goldmark customer, Molding Industries of America ("MIA"). Goldmark sold and delivered this shipment to Hanover on February 21, 1989 (Defendant's Exh. D2). On March 23, 1989, Hanover wrote to Goldmark complaining that the product was "rejected due to *black specs* and to *brittleness*" (emphasis on original) (Defendant's Exh. D3). Goldmark accepted the claim and sent a credit memo to Hanover dated March 1, 1989 (Defendant's Exh. D4) in the sum of $41,565.61, representing a total refund of the sales price in the amount of $27,281.60 plus "misc. other losses" in the sum of $14,284.01. The dates of these documents are either incorrect or confusing, or both.

The MIA delivery involving the same lot as the Hanover delivery, also resulted in a complaint based on black specs and breakage. Goldmark sold the product to MIA on March 3, 1989, represented by an invoice designated as Defendant's Exh. E1. On April 19, 1989 MIA wrote a letter to Goldmark complaining of black specs and breakage (Defendant's Exh. E2). Goldmark took back all of the product and gave MIA a credit memo in the sum of $26,920.00 (Defendant's Exh. E3). On June 19, 1990, some 15 months after the Hanover and MIA Transactions, Goldmark sent a debit memo to Goodson in the sum of $64,158.41 (Defendant's Exh. D5).

Again, this transaction between Goldmark and Hanover/MIA was apparently resolved in the November 1989 meeting of the parties, and was a subject of the Goodson memorandum dated November 27, 1989, following the settlement negotiations between Goldmark and Goodson on that date, as follows:

"Invoice # 7495—165,600 lbs. shipped December 9, 1988, hopper car number TLCX 38172. Invoiced at $.56 adjusted to $.48."

The Electra Poly transaction was covered by Goodson invoice 7362 dated September 30, 1988 (Defendant's Exh. 22A). Goldmark sold this shipment to Electra Poly in three deliveries dated January 11, 1989, January 17, 1989 and January 31, 1989 (see Defendant's Exhs. F2 & F3). On May 18, 1989, Electra Poly wrote to Goldmark complaining of brittle material. On May 23, 1989, Goldmark issued a credit memo to Electra Poly in the sum of $83,700.00. Gross testified that some

customers didn't request reimbursement for freight and other expenses, including MIA and Electra Poly. Some thirteen months later, Goldmark issued a debit memo to Goodson on June 19, 1990 (Defendant's Exh. F5) which provides, in part as follows:

"DEBIT MEMO

AGAINST INVOICE NO. 7362 $.52 LB $70,200.00

NON–SALEABLE REJECTED MOLDED PARTS DUE TO BRITTLENESS."

The Court notes that the Goodson memo of November 27, 1989 (Plaintiff's Exh. 14) which purports to resolve the Goldmark complaints, did not refer to the Electra Poly account (invoice 7362).

The final Goldmark customer complaint involved Atlan Plastic Inc. ("Atlan"), the only 1990 delivery involved in the setoffs, signified by Goodson invoice 9557, dated June 8, 1990. Following oral complaints, Atlan wrote to Goldmark on September 4, 1990 complaining of "flashing" and "breakage" and requesting a credit in the total sum of $24,300, including freight expense of $1800 (Defendant's Exh. A1). Strangely, prior to the issuance of the complaint letter, on August 7, 1990, Goldmark issued a credit in the sum of $24,300.

The Court notes that Goldmark had problems with the dates on its documents throughout the history of its relationship with Goodson. For example, only after Goodson went out of business in the summer of 1990, did Goldmark generate a flurry of debit memos claiming substantial setoffs. Continuing this erratic pattern, Goldmark issued a debit memo to Goodson relating to the Atlan invoice 9557 which is dated June 19, 1990 (Defendant's Exh. A5) in the sum of $21,150 which includes a debit of $19,350 and freight charges of $1,800. This debit memo is dated more than one month prior to the first Atlan oral complaint and is dated approximately two and one-half months prior to the Atlan complaint letter of September 4, 1990. In fact, this debit memo is actually dated prior to the sale by Goldmark to Atlan. Asked to explain this obvious and potentially material discrepancy, Gross testified as follows:

"Q ... Can you explain why the debit memo is dated approximately two months prior to the credit and a month prior to the actual shipment of the goods by Goodson?

A Yes. That was my doing.

Q And why did you do that?

A We had issued a series of debit memos to Goodson two months prior. And I wanted everything to be consistent with that. Goodson at this point was already out of business. I didn't believe that this particular point, if I dated it correctly in August, that anybody would recognize it as a proper credit or debit, as a matter of fact. So I did it in order to be consistent with the others.

. . . .

Q And does the document notwithstanding that date and the letter A reflect accurately the transactions that you had with Atlan and the loss sustained as a result of the defective materials that are listed in A–2?

A The answer is yes. And when you check back with Atlan you will find that to be so.

. . . .

THE COURT: It was made at or about the time of the transaction, but dated back?

THE WITNESS: Yes.

THE COURT: I will allow it in subject to that. The weight, however, is another matter" (Tr. at 172–175).

In fact, Gross testified that he told his assistant Sue Vinci to back date the debit memo. A problem with this procedure was that in August 1990, when the debit memo was created and mailed, Goodson had already closed its business, and there is doubt whether it would ever actually receive the document. In addition, in August 1990 when the debit memo was created and backdated, Gross knew that the Goodson account had been factored and that a financial institution had an interest in the accounts receivable. The Court finds that these debit memos were sent out by Goldmark to stake a claim and

there was no expectation of payment or even that a response to the documents would be made.

Significantly, Gross conceded that other than the Atlan and Electra Poly accounts, Goldmark received credit from Goodson as a result of the November 1989 meeting, as follows:

"THE COURT: Okay. Now, with regard to those transactions for which debit memos were issued, other than. Atlan and other than Electra Poly, you did receive credits from Goodson as a result of your meeting with Don Smith in November of 1989; is that correct?

A Only to the extent that they made some allowances on the price.

Q But during that time there were some allowances given?

A Yes, sir.

. . . .

Q Now, you discussed—withdrawn.

At your meeting in November of 1989, you knew about the Electra Poly problem, did you not?

A Yes, sir.

Q And did you bring it to Don Smith's attention at that time?

A Yes, sir.

Q Yet, there was no price transaction for that particular transaction that is listed in the memoranda that is shown, that counsel was kind enough to blowup for us, Plaintiff's Exhibit 14. That invoice is not listed here?

A That's correct.

Q And why wasn't there an adjustment made with regard to the Electra Poly invoice, while you made some adjustments on the others?

A Historically, Don Smith—in fact, I also, were people who procrastinated a lot. And what would happen is we would take the thing up and resolve only part of the problem always. And at this particular point in time they were just dealing with these three· hopper cars.

. . . .

Q Now, had Tom Howard conducted any investigations with regard to the complaints?

A He may not at that point have completed his investigation into the Electra Poly complaint, but he had as to the others, yes.

Q To your knowledge—withdrawn.

So, with regard to the problems with Hanover, Valiant and MIA, Tom Howard had conducted an investigation?

A He had, yes.

Q And do you know what the result of that investigation was?

A He was determined that the complaint was well founded.

Q In each case?

A In each case.

Q And as a result that was a topic of conversation at the November 1989 meeting?

A Yes, sir" (Tr. at 175–178) (emphasis supplied).

The Court credits the testimony by Gross that there is a custom and usage in the plastics industry, that claims can be adjusted six months or a year after deliveries, sometimes even after the invoices are paid. This is because of the deliveries to third-party end-users, who may delay using the product and discover defects at varying periods of time after the delivery dates.

As stated above, Gross knew that Goodson was being financed and that its loans were collateralized by the Goodson accounts receivable. Further, in the spring of 1990 he knew that Goodson was having financial problems and "were going to be foreclosed on." Upon learning this, Goldmark started to substantially increase its purchases.

### THE NOVEMBER 1989 MEETING

When Gross went to the November 1989 meeting in Manhattan, he knew of the Valiant, Hanover/MIA and Standard claims. The meeting occurred in the second or third week of November, within a week prior to the November 27, 1989 memorandum (Plaintiff's Exh. 14). Present at the meeting was Gross for Goldmark and Daniel L. Patrick

and Donald V. Smith from Goodson. Gross conceded that the principal reason for the meeting was to resolve the complaints made by Goldmark's customers:

"Q And it was one of the reasons you met, to talk about problems, wasn't it?

A Sure.

Q Sure.

And those were of grave concern to you?

A Very much of concern to me.

THE COURT: When you use the word problems in this case, you are talking about the complaints made by customers?

THE WITNESS: Claims.

THE COURT: Claims is what you understand problems to be?

MR. HARRINGTON: Yes, your Honor.

THE COURT: All right.

Q Now, in fact, those claims had, starting clear back in 1989, in the months (sic) of August, that had caused you, had it not, to in effect get the attention of Goodson for you to delay payments; is that correct?

A Yes, sir.

. . . .

Q That's right, for leverage. In other words, I am not going to pay you or push you past the 90 days so I can get your attention on the complaints; is that correct?

A That's right" (Tr. at 235–236).

Although Goldmark had received complaint letters from Hanover/MIA, Standard and Valiant prior to the November 1989 meeting, they were never sent to Goodson, because, allegedly, "they never asked" (Tr. at 243). Gross admitted, however, that the November 1989 meeting related to "our complaints on the material" (Tr. at 244).

At the time of the November 1989 meeting, Goldmark owed Goodson a balance of more than $300,000. The proof reveals that after this meeting the balance due was dramatically reduced to close to zero according to a graph showing balances outstanding (Plaintiff's Exh. 16B–1). Gross admitted that, among other things, the meeting was to "resolve some of the allowance that should be given to me as a result of some of the

materials" (Tr. at 187). After the meeting Goldmark started to buy "aggressively." From June 8, 1990 to July 16, 1990, a period of approximately six weeks, Goldmark purchased "approximately $222,000 worth of material."

With regard to the critical November 1989 meeting itself, Gross testified that while the words "final resolution" were never spoken, he conceded that some "understanding" was reached by the parties at this meeting and that "adjustments" were discussed (Tr. at 198).

NED P. GYLLENSKOG, a certified public accountant, was in charge of finance and administration for Goodson from March 1988 until the business closed. In September or October 1989, Don Buysse of Goldmark informed him that "because of claims on the defective material they were not going to pay any more invoices." Buysse told him that "the claims needed to be resolved and they would not pay any more invoices until they were" (Tr. at 337, 377). The November 1989 meeting was then held. Thereafter, he received the November 27, 1989 memo from Donald Smith (Plaintiff's Exh. 14). The credits issued to Goldmark at the November 1989 meeting were reflected in Goodson's records (see, for example, Plaintiff's Exhs. 16(B)1 and 16(B)2). After the November 1989 meeting, Goodson had no further collection problems with Goldmark. Gyllenskog testified that if there was a $300,000 plus claim outstanding by Goldmark, it would have been reported to him—and there was no such claim reported.

RAYMOND L. GOODSON was the President of Goodson and in charge of its operations. With regard to the Goldmark account, on behalf of Goodson, Dan Patrick had the lead role and Don Smith who was in charge of sales was also involved. In the summer of 1989 Goodson had a problem with Goldmark in that "they didn't pay their bill," and Raymond Goodson told Smith "to get this situation resolved." He told Smith to "go and meet with Goldmark and come to a mutually acceptable agreement" (Tr. at 512). Raymond Goodson candidly testified that the

1989 Goldmark complaints as to defective product, were valid.

After the meeting in New York between Gross, Smith and Patrick, Raymond Goodson testified with regard to a telephone call he received immediately after the meeting:

"Q And what did Don Smith and Dan Patrick say on the phone, immediately after the meeting, what did they say to you?

A They told me that the matter had resolved, and then they told me how much it cost to resolve it.

Q Okay. Now, Mr. Goodson, I am going to spend some time there and ask for your best recollection because this is again, very important.

They had the matter resolved. And what did you understand the matter to be?

A The matter would be all the complaints that kept Ken from paying his bill. .

. . . . .

Q Did Mr. Smith say anything else to you?

A He told me that there was this adjustment that the claims were resolved with the adjustment.

Q And let me see what it meant to you.

A We took more than a $50,000 hit.

Q Was it a big hit?

A I think it was the biggest single credit memo we ever issued.

. . . .

Q Was there anything that gave you any evidence of this being a final resolution?

MR. AUSTIN: Objection.

THE COURT: Yes or no?

THE WITNESS: Yes.

Q And what was that?

A The commitment to pay bill, to pay the bill. And the bill was paid.

. . . .

Q Did Goldmark pay you very quickly?

A Relatively quickly, but they did pay.

Q Subsequent to Goldmark's payment in November, December, January, of 1990, were there any other claims asserted by Goldmark?

A None that were brought to my attention.

Q Okay. Were there any claims asserted in March, April and May of 1990?

A Not that I was aware of.

Q Okay. Do you know if Goldmark continued to purchase polystyrene from Goodson?

A They did" (Tr. at 513–515).

Raymond Goodson testified that he never heard of any of Goldmark's present complaints until "after we closed the plant" and First Security tried to collect the outstanding accounts receivable. Until that time Goodson received no written or verbal notice of any claim by Goldmark. As did every other Goodson employee, Raymond Goodson also testified that he never received any debit memos from Goldmark.

DANIEL L. PATRICK testified by deposition. He was a salesman of polystyrene for Goodson. Don Smith was the Goodson sales manager. After Goodson went out of business, Patrick worked for Goldmark for almost a year. As a former employee of both firms, and a participant in the meeting, Patrick's testimony as to the November 1989 meeting is especially significant:

"Q What was the date of this meeting approximately?

A It says here November 27th, 1989, so it would have probably been a couple days before that.

Q How many shipments were you discussing at the time?

A It looks like five different cars here.

Q You're referring to the five invoices where price adjustments were made?

A Right.

Q Would there have been other shipments that could have been discussed at this meeting?

A *I believe at this point we resolved everything at that time on the books with Goldmark. I don't believe we had any other outstanding complaints or problems that were not handled here.*

Q So this would have been a resolution of all the complaints up through the date of the meeting that had been made to Goodson?

A That's how I remember it.

Q Now, it says here on the first line that Dan Patrick and I met with Ken Gross of Goldmark and finally resolved the complaint hopper cars. Is that a fair and accurate description of the result of the meeting in your opinion, that it was a final resolution of the complaints?

A Yes, it was.

. . . .

Q In that case was it negotiated between Ken Gross and Don Smith?

A Yes.

Q And Ken Gross accepted those prices—

A Yes.

Q —as a final resolution of complaints?

A On these—on this particular meeting, yes, it was all resolved" (emphasis supplied) (Dep.Tr. at 60–62).

Patrick testified that the November 1989 settlement included Goodson invoices number 7685 (the Standard transaction), 7898 (the Valiant transaction) and 7495 (the Hanover/MIA transaction).

DONALD V. SMITH also testified by deposition. He was the Goodson Vice President of sales and raw material procurement. In his present capacity he is associated with Deltech, the successor firm to Goodson. He still does business with Goldmark and Gross and he is not a "fan" of Mr. Goodson who owes him "a substantial amount of bonus money." The usual manner in resolving complaints such as the Goldmark defective product complaints, was by giving a price reduction to the customer.

Smith was shown a copy of his memo to Gyllenskog dated November 27, 1989 (Plaintiff's Exh. 14). He remembered writing the memo, signed by the secretary and fully authorized by him. He met in New York City with Patrick and Gross "with the intent in mind of getting these complaints resolved" (Dep.Tr. at 61). As to the result of this meeting, Smith, concededly with a bias against Goodson, testified as follows:

"Q At the time that you wrote this memo, that was a final resolution of the complaint hopper cars, was it not?

A At that time, yes.

Q And while in the employ of Goodson Polymers, you knew of no other complaints or problems with respect to these hopper cars, correct?

A Yes. I received no correspondence or had a verbal discussion, other than as I say that Goldmark was still having problems, apparently, out in the field" (Dep.Tr. at 71–72).

Smith testified that the settlement in the November 1989 meeting involved invoice numbers 7615 (the Standard transaction), 7898 (the Valiant transaction), and 7495 (the Hanover/MIA transaction) and all complaints as to the invoices were "finally resolved."

The Court finds that at the November 1989 meeting the parties agreed to finally and completely resolve the product defect complaints with regard to invoice numbers 7495, 7615, 7694, 7764 and 7898. Among these invoices was the Hanover and MIA complaints (Invoice 7495), the Standard complaint (Invoice 7615) and the Valiant complaint (Invoice 7898). The Court further finds that the total amount of the credit to Goldmark agreed upon by the parties was the sum of $53,842. (See Plaintiff's Exh. 15A). This credit was recognized and confirmed by Goldmark by way of a check drawn by Goldmark to Goodson dated November 20, 1989 in the sum of $38,143 (Plaintiff's Exh. 15C). In the stub of the check appears the following: "11–20 Credit $53,-842."

Although Gross testified that the credits given at the November 1989 meeting were only a partial settlement, the following testimony by Gross is illuminating:

"Q Let's talk about 15C, that check, Mr. Gross, and move backwards.

In the annotation, which I believe is to the left, do you see a credit there for approximately $53,000?

A Yes, sir.

Q Now, that constitutes the credit that was given as a result of the meeting of November of 1989, is it not?

A Yes.

Q And you freely accepted that, did you not?

A Surely.

Q At the time you accepted that did you make any written reservation of rights with respect to the receipt of that credit?

A I never had made any written reservation of rights at any time.

Q Now, after that meeting in November of 1989, did—let's start with from the bottom top here, did Valiant make any further claims?

A No, sir.

Q Did Standard make any further claims after November 1989?

A No, sir.

Q And Hanover, MIA, did they make any further claims?

A No.

Q So, as of November 1989, you knew of all the claims with respect to those ends users; is that correct?

A Yes, I did.

Q Mr. Gross, I will ask you to now turn your attention to Exhibit 16B–1.

This is an exhibit Mr. Gross, that your counsel has used previously.

What happens to the balance owed by Goldmark to Goodson after the meeting in New York in November 1989.

A It declined.

Q Precipitously, doesn't it?

A Yes.

Q And what happens is all the way into March it drops down to almost $13,000, does it not?

A That's correct" (Tr. at 251–253).

The Court finds that of the $53,842 credit issued to Goldmark at the November 1989 meeting, the sum of approximately $32,000 involved the Hanover, MIA, Standard and Valiant invoices. The Court further finds that the parties agreed to settle and compromise the Goldmark product defect claims as to all these deliveries by the $32,000 credit to Goldmark.

The credibility of Gross was impeached when he freely admitted that he knew a financial institution had factored Goodson and held an assignment of the Goodson accounts receivable and, yet, he ordered additional product, knowing he was not going to pay for it:

"Q Okay.

You did know practically throughout the relationship with Goodson that there was a financial institution involved with financing the accounts receivables, did you not?

A Yes, sir.

Q And you knew that in fact that financial institution had a security interest in that collateral, did you not?

A The answer is yes.

Q Okay. Then what you did at the end of May and beginning of June and end of July, you bought a whole bunch of product, knowing you were not going to pay for it, and that product was held as security by a financial institution; is that correct.

A That's correct.

. . . .

Q And you had no intention of paying for it?

A I only had the intention of paying for that portion which was above the offsets" (Tr. at 257–258).

Gyllenskog was shown the five Goldmark debit memos introduced by the defendant representing the alleged defective product. (See Defendant's Exhs. A5, B4, C6, D5 and F5). He testified that he saw none of them, even though the memos were correctly addressed and he would have seen them if they were sent to the Goodson office. The Court credits this testimony and finds that Goldmark never mailed these debit memos to Goodson.

## THE SALVAGE ISSUE

### Electra Poly

The Electra Poly sale by Goldmark consisted of 135,000 pounds of product. The molded product was sold by Electra to a

reprocessor. No product was returned to Goldmark. Gross testified that for molded product the salvage value was five cents a pound if returned to Goldmark. Gross conceded that sometimes "I pick it up for free" (Tr. at 295). 135,000 pounds times five cents is the sum of $6,750.00.

TOM GESSLER, the Vice President of Electra Poly Corp., testified by deposition. The complaint of Electra Poly was that the material "had no impact strength . . . and it cracked like glass." He made no payment for the shipment of polystyrene from Goldmark. There was no unused and/or unmolded product. The alleged defective molded product was sold to a re-processor. The only relevant document in the possession of Electra Poly is the credit memo from Goldmark.

With regard to Electra Poly, Gross testified that he took back no material. He was going to permit Electra Poly to keep the material because of the delivery expenses involved, even though the material had a scrap value:

"Q Did that material have any value to you otherwise?

A Yes, it could have.

Q In what way?

A It could have had a scrap value.

Q Now, what would the scrap value for that product, polystyrene, have in 1989?

A I would have paid for product like that approximately five cents a pound delivered back to my facility in New Hyde Park. So any other cost that would be attendant to taking it back would be deducted from that.

Q And what other costs would be attendant to dealing with scrap?

A Well, first of all shipping cost from wherever it was located, and whatever other cost might have been necessary to re-group the locations from where it was located once it had been manufactured. Those would be the costs which would be deducted from the nickel. And I would have costs thereafter.

. . . .

Q So the net value to Goldmark of that material would be how much?

A Maybe two, three cents, although it had a value of five delivered to my place. The best I could have hoped to get out would have been a couple of pennies net. As I said before, I would be concerned about other costs.

. . . .

Q Now, with regard to value, do you have any recollection as to what happened with that material?

A No, sir, I do not.

Q What would the value of the material in its damaged condition, the complaint you received from your customer, would have been?

A It would have been five cents delivered back to my door.

Q And in an unmolded or molded fashion?

A In the molded fashion. In an unmolded fashion would have higher value" (Tr. 204–207).

*The Atlan Account*

DAN McINTYRE, the President of Atlan, testified by deposition. He contends that the problems with the Goldmark delivery of polystyrene were "melt flow and breakage." Goldmark made two shipments and Atlan paid for one. McIntyre testified that all the material was used and that there was no unmolded product. As to the Atlan account, the customer returned nothing and kept all of the material. Goldmark never asked Atlan to return the material. According to Gross, in a molded condition "it would have been worth five cents to us, delivered back to our door."

The plaintiff's position with regard to the salvage value of the defective product was introduced by the testimony of DR. WILLIAM E. GIBBS. In the opinion of Dr. Gibbs, the unmolded portion of the defective product has a salvage value of 42 cents per pound, as opposed to the Gross opinion of 25 cents per pound. As to the molded material, Dr. Gibbs opined that the product could be regrinded and was of the salvage value of ten

cents per pound, as opposed to the Gross opinion of five cents per pound.

As to the amount of the unmolded product as opposed to molded product, Dr. Gibbs made the assumption "that at most one-third of the material would be consumed before the problem, if it were serious, would be evident" (Tr. at 617). He, therefore, assumed that the balance, or two-thirds of the product, would remain unmolded. Based on these opinions, Dr. Gibbs testified that the salvage value of the Electra Poly product was the total sum of $42,100.00. As to the Atlan invoice involving 45,000 pounds, Dr. Gibbs assumed that the entire product was molded with a salvage value of twenty percent of the sales price, or nine cents per pound, resulting in the sum of $3,900.00 as the salvage value.

## THE SPOLIATION ISSUE

The Goodson manufacturing plant was in Troy, Ohio and its main office was in Salt Lake City, Utah. All the documents in the Salt Lake City office were boxed and put in a storage unit. The production and sales records, including invoices and the claims records, were kept in Troy, Ohio. No documents were shipped from Troy to Salt Lake City after Goodson stopped manufacturing.

In late September 1990, Gyllenskog and Paul Toller of First Security Bank inspected the documents in the Salt Lake City storage unit. They "pulled" all of the documents relating to accounts involving collection difficulties, including Goldmark. Gyllenskog described the search for records, as follows:

"A   Each of the boxes was organized by a client, or customer, in the case of accounts receivable. So that—and by year. And accounts payable was also by vendor and by year, and payable information was by month.

Q   Well, physically how were the files, what did they look like?

A   All the documents were inside Manila folders, similar to these type of folders with a customer's name on it, filed in pendiflex files.

Q   Did you and Mr. Toller review every file of Goodson Polymers in the storage shed?

A   Every file in the accounts receivable boxes, and scanned through all the other files to see if they were accounts payable, payroll.

Q   Would there have been any accounts payable records involving Goldmark?

A   No.

Q   Did you pull every file in the accounts receivables records of Goodson dealing with Goldmark?

A   Yes" (Tr. at 407).

After these documents were removed, Gyllenskog does not know what happened to the other records left in the storage unit, consisting of rented space. There is strong circumstantial evidence as to what occurred to the records, since there was a sign posted on the door of the rented space which stated that if the account was not paid, the unit would be opened and the items would be sold or thrown away.

Toller testified that he inspected the Goodson records in the storage area in Salt Lake City in September 1990. He went through every box and pulled and removed all the files on certain customers, including Goldmark. These records were the ones produced, served on the defendant and introduced at the trial. Toller testified that he removed all of the relevant documents involving the Goodson–Goldmark transactions. He also mailed a request to the Goodson trustee to search the Troy, Ohio plant for Goldmark records, but none were found. In his review of the records, Toller saw no Goldmark debit memos.

At the trial Goldmark moved to preclude First Security or for the Court to make an adverse interest determination against First Security, based on its claim of spoliation of Goodson records by Goodson and First Security. The Court made a ruling on the spoliation issue. After reviewing the relevant authorities, including *Berkovich v. Hicks,* 922 F.2d 1018 (2d Cir.1991); *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119 (7th Cir.1987); *INA Aviation Corp. v. United States,* 468 F.Supp. 695 (E.D.N.Y.1979);

*Turner v. Hudson Transit Lines,* 142 F.R.D. 68 (S.D.N.Y.1991); *Bank of Crete v. Koskotas,* 733 F.Supp. 648 (S.D.N.Y.1990); and *Seiler v. Lucasfilm Ltd.,* 808 F.2d 1316 (9th Cir.1986); the Court denied Goldmark's motion for the reasons stated in the record.

In sum, the Court found that the Goodson and First Security representatives made a good faith attempt to retrieve all of the relevant records; that there was no litigation pending at that time; that the plaintiff never received any of the Goldmark debit memos; and that there was no intentional or even negligent destruction of the records.

### DISCUSSION

#### A. *Notice*

█ First Security alleges that Goldmark failed to give proper notice of the defective product with regard to invoice 7362 (Electra Poly) and 9557 (Atlan). There is no dispute that Goodson delivered and Goldmark, or its end-user received the product involved in both these invoices. Goldmark's only claim, as a setoff to the monies it concededly owes, is that the product was defective. Since Goldmark did not reject the product, the provisions of Uniform Commercial Code § 2–607 are applicable. The pertinent part of this statute reads as follows:

"§ 2–607. **Effect of Acceptance; Notice of Breach; Burden of Establishing Breach After Acceptance; Notice of Claim or Litigation to Person Answerable Over**

(1) The buyer must pay at the contract rate for any goods accepted.

. . . .

(3) Where a tender has been accepted

(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;

. . . .

(4) The burden is on the buyer to establish any breach with respect to the goods accepted."

This section provides in subdivision one that where goods have been accepted "the buyer must pay at the contract rate for any goods accepted." Subdivision 3(a) states that where the product has been accepted the buyer must notify the seller of a breach—in this case the breach is the delivery of defective product—within a reasonable time after it discovers or should have discovered the defective product, or be barred from claiming a setoff of breach of warranty.

UCC § 1–204 defines what is meant by a "reasonable time," as follows:

"§ 1–204. **Time; Reasonable Time; "Seasonably"**

(1) Whenever this Act requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.

(2) What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.

(3) An action is taken "seasonably" when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time."

█ Section 1–204(2) states that what constitutes a "reasonable time" depends on the nature, purpose and circumstances of the particular case. A reasonable time depends upon the circumstances of each case and the term is to be treated flexibly. *Schnitzer v. Lang,* 239 N.Y. 1, 5, 145 N.E. 65, 66 (1924); *Zahn v. Gulf Oil Corp.,* 204 Misc. 678, 125 N.Y.S.2d 55 (Sup.Ct. Kings Co.1953), *aff'd* 283 A.D. 951, 130 N.Y.S.2d 882 (2d Dept. 1954).

Applying these principles to the facts of this case, it is clear that notice to Goldmark of any defects in the product would be delayed because of the nature of its business. As a broker of the plastic product, Goldmark did not use the plastic itself. It sold the plastic product to third parties known as end-users. In most instances only when the end-user actually used the material would any defects be discovered. It is equally plausible that there would be additional delays before the end-user would actually mold the plastic thus revealing defects such as black spots or brittleness. For these reasons, a

reasonable time to Goldmark could be varying and could involve substantial periods of time.

In this case, under the delayed procedure implicit in these transactions, the Court finds that Goldmark did give notice of the defective product "within a reasonable time."

## B. *The Disclaimers in the Bill of Lading*

■ Although not referred to in the proposed findings of fact and conclusions of law, First Security previously contended that the Goodson bills of lading exclude any recovery for incidental or consequential damages and limit any setoff claim to the value of the material shipped to Goodson. By the terms of New York UCC § 2–719(1), (3) a party may contractually limit breach of warranty damages. Also, the bills of lading contain disclaimers as to the warranties involved in the sales.

The Court agrees with the defendant that Goodson's attempt to limit or disclaim warranties on the bill of ladings or invoices are not binding on Goldmark. As stated in *Tuck Industries, Inc. v. Reichhold Chemicals, Inc.*, 151 A.D.2d 566, 542 N.Y.S.2d 676 (2d Dept. 1989), in this oral agreement relationship, these invoices and bills of lading not signed by Goldmark would constitute "a material alteration of the ... terms of sale of the largely unwritten agreement between the parties" (see UCC 2–207, official comment 4). See also *Step–Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91, 103, 104 (3d Cir.1991) (terms repeated in numerous written confirmations do not necessarily become part of the contract).

The Court finds that First Security failed to prove that Goldmark ever received or even saw the reverse side of the bills of lading or the relevant language in the invoices at issue. Therefore, Goldmark could not be bound by such provisions. Thus, there was no waiver of the warranties available to Goldmark and there was no contractual limitation on the amount of damages which could be asserted by Goldmark in its setoff claims.

## C. *The Estoppel/Bank Fraud Defense by First Security*

■ First Security argues that Goldmark should be estopped from denying liability on the unpaid invoices because "Goldmark fraudulently induced Goodson to make shipments on those invoices" (First Security Proposed Findings & Conclusions at 39).

The Court finds that Gross testified that he knew the Goodson accounts receivable were being factored and that he ordered substantial deliveries knowing that Goldmark "only had the intention of paying that portion which was above the offsets." (Tr. at 257–258). Since Goodson had closed its business and probably could not pay the claimed setoff damages for breach of warranty, Goldmark ordered additional product to protect the amount of its damages. No doubt Goldmark was trying to take advantage of the situation. However, the Court cannot find, on these facts, that First Security proved, by clear and convincing evidence, that these were fraudulent transactions. Accordingly, the First Security estoppel/bank fraud defense to the setoffs has not been established.

## D. *Accord and Satisfaction—Settlement*

■ With regard to the affirmative defense of accord and satisfaction, the burden of proof is on the party claiming such a defense. *Conboy, McKay, Bachman & Kendall v. Armstrong*, 110 A.D.2d 1042, 488 N.Y.S.2d 901, 902 (4th Dept.1985). In this case the plaintiff First Security interposes this defense to the setoff claims of Goldmark and has the burden of proof.

An accord and satisfaction is "a form of contract whereby one party agrees to give or perform, and the other party agrees to accept, what is offered in settlement of an outstanding claim. When this contract, or accord, is executed, the claim is satisfied." *Pepper's Steel & Alloys, Inc. v. Lissner Minerals & Metals, Inc.*, 494 F.Supp. 487, 496 (S.D.N.Y.1979). "Because it is an independent contract, an accord and satisfaction requires a 'meeting of the minds'." *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714 (S.D.N.Y.1986).

Stated otherwise, the "essential elements of an accord and satisfaction are dispute as to the amount due and knowing acceptance by the creditor of a lesser amount." *Consolidated Edison Company v. Jet Asphalt Corp.*, 132 A.D.2d 296, 522 N.Y.S.2d 124 (1st Dept. 1987). See also *Schuttinger v. Woodruff*, 259 N.Y. 212, 216, 181 N.E. 361 (1932).

As enunciated by the New York Court of Appeals in *Werking v. Amity Estates Inc.*, 2 N.Y.2d 43, 155 N.Y.S.2d 633, 641, 137 N.E.2d 321, 326–27 (1956), in language particularly applicable to the facts in this case, an accord is an agreement whereby one party undertakes to give, and the other party to accept in settlement of an existing claim, something other than what he believes himself to be entitled. See also *Reilly v. Barrett*, 220 N.Y. 170, 172–173, 115 N.E. 453 (1917). One of the facets of a legal accord and satisfaction is a settlement and compromise of the amount claimed due. *McMahon v. Pfister*, 39 A.D.2d 691, 332 N.Y.S.2d 591, 592 (1st Dept.1972). Of course, in order to prove an accord and satisfaction type settlement there must be the intent by the parties to accept the settlement sum as a satisfaction of the prior claim. See *Werking, supra*, 155 N.Y.S.2d at p. 641, 137 N.E.2d at pp. 326–27; *S. Leo Harmonay Inc. v. Binks Mfg. Co.*, 597 F.Supp. 1014 (S.D.N.Y.1984); *Corbin on Contracts* §§ 1276 and 1277.

In this Court's view, the dispositive rule was stated by then District Judge Leval in *Pepper's Steel & Alloys Inc. v. Lissner Minerals, supra* at 494 F.Supp. 496, 497:

"... In appropriate instances, the acceptance by one party of benefits offered in settlement by the other will give rise to an inference that the differences have been settled by the proffered agreement. *See e.g., Welbourne & Purdy, Inc. v. Mahon*, 54 A.D.2d 1046, 388 N.Y.S.2d 369 (1976). Again, the resolution whether or not there was the meeting of the minds necessary to create the accord requires the court to examine the circumstances surrounding the putative contract, including the parties' expressions of intent. *See e.g., Werking v. Amity Estates, Inc.*, 2 N.Y.2d 43, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956). *See generally A. Corbin, supra*, at § 1277."

Goldmark's counsel does not dispute that "Goldmark and Goodson negotiated certain price adjustments on invoice numbers 7495 (Hanover/MIA), 7615 (Standard) and 7898 (Valiant)" but disputes that these "adjustments constituted an accord and satisfaction on all claims pending at that time." (Defendant's Tr. Brief at 3–4). The Court disagrees and finds that the parties settled the Goldmark breach of warranty claims as to these three invoices.

The evidence is clear and undisputed that the Goldmark end-users at issue had given it notice, orally and by claim letter, of the defects asserted prior to the November, 1989 meeting. The parties then agreed to meet in New York to resolve these complaints. Both parties agree that they met and negotiated in New York in November 1989, in an effort to resolve the Goldmark customer complaints with regard to the various alleged defects in the product. In fact, Gross wrote to Don Smith on May 25, 1989 regarding the problems with the polystyrene, stating that "it is essential that you, or your technical person come to see us ... in order to solve these problems" (Defendant's Exh. I). The parties negotiated with the express intent of resolving the product defects uncovered by the Goldmark end-users by reducing the price. There was a valid dispute existing as to the product defects and the proper price at the time the parties met.

The Court finds the parties settled their differences and agreed on a discount to be given to Goldmark as a result of defective product as to Goodson invoices 7495, 7615 and 7898. The Court finds that the matter was finally settled at that time. Following the meeting, Smith wrote to Gyllenskog on November 27, 1989, that Ken Gross of Goldmark and Dan Patrick and Don Smith of Goodson met and "finally resolved" the complaints. The memo outlined the invoices involved and the "agreed upon (adjusted) price." Goodson was to credit Goldmark's account and Ken Gross would send out a "healthy" check. In fact, Goldmark did send out such a check, on which were the words "11–20 credit $53,842."

In addition, Smith, Patrick and Goodson all testified unequivocally that the parties set-

tled the quality dispute with regard to the invoices at issue at the November 1989 meeting. Especially persuasive was the testimony of Patrick, who subsequently worked for Goldmark, and Smith who did business with Goldmark and apparently had a strong dislike for Raymond Goodson.

Although Gross hedged on the subject, he did testify that at the meeting, the question of the setoffs for defective product "was very much of concern to me," that the meeting related to "our complaints on the material," and that he had delayed payments "to get the attention of Goodson." Gross further conceded that after this meeting, a check was issued by Goldmark on which was stated a "11–20 credit $53,842," (Plaintiff's Exh. 15C) which constituted the credit to Goldmark agreed upon at the November 1989 meeting; that he freely accepted this credit without reservation; and that Goldmark never made any further claims as to the Standard, Valiant and Hanover/MIA defective product setoff, until Goodson went out of business and this litigation by First Security to recover unrelated accounts receivable loomed before Goldmark.

It is significant that Goldmark never wrote, stated or indicated in any manner that it was preserving or reserving its rights with regard to the alleged defects in the product involved in the three invoices. Nor did it take any action inconsistent with an intent to fully resolve these disputes. That is, it took no such action only after Goodson closed its business in the summer of 1990 and the debt to First Security had to be paid.

Although not dispositive, it is also supportive of the November 1989 accord and satisfaction that Goldmark's account payable clerk confirmed in writing that as of May 16, 1990, Goldmark's debt to Goodson was the sum of $158,830.80, with no corresponding debt owed by Goodson. The Court finds that Ms. O'Neil had the authority to respond to the Goodson request as to the Goldmark accounts payable.

Accordingly, the Court finds that at the November 1989 meeting in New York City Goldmark and Goodson entered into a binding accord to settle the Goldmark claims as to defective product with regard to invoices 7495, 7615 and 7989, involving the Hanover/MIA, Standard and Valiant transactions. Stated otherwise, First Security has sustained its burden of proving an accord and satisfaction with regard to the above invoices and transactions. Having accepted the benefit of the settlement and price adjustment, Goldmark is entitled to no further setoff with regard to these invoices.

### E.  *Setoff to Goldmark*

It is conceded by Goldmark that the net balance due to First Security on all unpaid invoices is the sum of $322,342.96. As a result of this accord and satisfaction finding with regard to Goodson invoices 7495 (Hanover/MIA), 7615 (Standard) and 7989 (Valiant), Goldmark is limited to setoff claims as to invoices 7362 (Electra Poly) and 9557 (Atlan).

The Court finds that Goldmark has established that it is entitled to a setoff because of defective product with regard to invoice 7362, the Electra Poly delivery in the sum of $70,200, and with regard to invoice 9557, the Atlan delivery in the sum of $21,150. (See Defendant's Debit Memo, Defendant's Exh. A5). These setoffs total the sum of $91,350. Crediting Goldmark with the total price of invoices 7362 and 9557 in the total sum of $91,350.00 and deducting said sum from the net balance due of $322,342.96, First Security would be entitled to the net sum of $230,992.96. In addition, First Security would also be entitled to the salvage value, if any, of the defective product as to the Electra Poly and Atlan invoices.

### F.  *Mitigation of Setoff Damages by Goldmark—Salvage Value*

■  With regard to the setoffs based on defective product, as an injured party Goldmark was obligated to take reasonable steps to mitigate its damages. *The Bank of New York v. Amoco Oil Company,* 35 F.3d 643 (2d Cir.1994); *Air et Chaleur v. Janeway,* 757 F.2d 489 (2d Cir.1985); *Amusement Business Underwriters v. American International Group,* 66 N.Y.2d 878, 498 N.Y.S.2d 760, 489 N.E.2d 729 (1985); *Jewish Press Inc. v.*

*Willner,* 190 A.D.2d 841, 594 N.Y.S.2d 51 (2d Dept.1993); UCC § 2–715.

As to the remaining two setoff invoices at issue, 7362 (Electra Poly) and 9557 (Atlan) the Court finds that the salvage values to be deducted from the Goldmark setoff claims based on the testimony of Kenneth Gross, which the Court accepts, are as follows:

| | |
|---|---|
| 7362—Electra Poly | $6750.00 |
| 9557—Atlan | 2250.00 |
| TOTAL SALVAGE VALUE | $9,000.00 |

Accordingly, the Court finds that the plaintiff First Security is entitled to a judgment against Goldmark in the sum of $230,992.96, as stated above, plus the salvage value of $9,000, making the total sum of $239,992.96.

### G. *Prejudgment Interest*

■ The availability of prejudgment interest in this diversity case is determined by New York law. CPLR 5001(a) provides that interest "shall be recovered upon a sum awarded because of a breach of performance of a contract." The award of prejudgment interest is now a statutory mandate. "Where the action is one at law, interest under the statute is recoverable as of right." *Hilord Chemical Corp. v. Ricoh Electronics, Inc.,* 875 F.2d 32, 39 (2d Cir.1989). *See also Trademark Research Corporation v. Maxwell Online, Inc.,* 995 F.2d 326 (2d Cir.1993); *Delulio v. 320–57 Corporation,* 99 A.D.2d 253, 472 N.Y.S.2d 379 (1st Dept.1984).

Under New York law interest is computed under the provisions of CPLR 5001(b) as follows:

"(b) **Date from which computed.** Interest shall be computed from the earliest ascertainable date the cause of action existed except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

In order to determine the date to compute interest in this case, the Court must consider the question of the effect of the setoff to which Goldmark is entitled. Prejudgment interest is awarded to fully compensate a party for the actual damages incurred, namely for the period of time the injured party has been deprived of the use of the monies due and owing. *Miner v. City of Glen Falls,* 999 F.2d 655 (2d Cir.1993). However, the Court must be careful to avoid over-compensating a plaintiff by the award of prejudgment interest. *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608 (2d Cir. 1994); *pet. for cert. filed* 63 U.S.L.W. 3092 (6/18/94).

The few cases dealing with setoffs seem to indicate that a valid setoff in favor of the defendant should be deducted from the plaintiff's award prior to fixing interest. For example, in *Sloan v. Pinafore Homes, Inc.,* 38 A.D.2d 718, 329 N.Y.S.2d 420 (2d Dept. 1972) the Court held:

"In our opinion, the trial court should have offset defendant's smaller recovery, for costs, against the plaintiffs' larger recovery and then awarded a net judgment in plaintiffs' favor for the balance, to wit, $3,125.25, plus interest. Setting off one recovery against another is a procedure recognized by the textbooks and authorities (*Neenan v. Woodside Astoria Transp. Co.,* 261 N.Y. 159, 163, 184 N.E. 744, 745; .cf. *Matter of Weiser v. City of New York,* 16 A.D.2d 666, 226 N.Y.S.2d 929). Plaintiffs' recovery on their claim and defendant's recovery for costs are mutual debts and, in such case, only the balance is owing (see *Prindle v. Rockland Transit Corp.,* 263 App.Div. 1010, 34 N.Y.S.2d 411, cf. *Braun v. Finger, Sup.,* 113 N.Y.S. 573).

*See also Kooperman v. Picoult,* 41 A.D.2d 980, 343 N.Y.S.2d 732 (3d Dept.1973) (The trial court used the expedient of offsetting the award before determining the interest due).

The Court agrees with the method of deducting the setoff prior to the fixing of interest. The award of interest is an equitable remedy designed to fully and fairly compensate an injured party for its actual loss. Here, theoretically, Goodson should have credited Goldmark with the amount of the valid setoff for breach of warranty, namely the sum of $91,350. Therefore, Goodson should only be entitled to interest on the unpaid balances after deducting the valid

setoff, namely the sum of $91,350 less the amount of salvage to be credited to the plaintiff in the sum of $9,000.00 or the sum of $239,992.96.

As to the date the interest should be computed, the "earliest ascertainable date," is a reasonable time after First National made a claim for payment to Goldmark, in its letter dated June 29, 1990 (Plaintiff's Exh. 24B). In this case, Goodson and Goldmark had implicitly agreed on payment within ninety days. Therefore, following this same custom and practice, interest shall be computed from a period ninety days after June 29, 1990, namely, from September 29, 1990. Therefore, interest on the amount due of $239,992.96, shall be computed from September 29, 1990.

### CONCLUSION

Giving the defendant Goldmark credit for the full amount of its setoff for the Electra Poly and Atlan invoices and adding the reasonable amount of the salvage value as to those invoices, judgment is rendered in favor of the plaintiff First Security Mortgage Company against the defendant Goldmark Plastics Compounds, Inc. in the sum of $239,992.96, together with interest from September 29, 1990. The Clerk is directed to enter judgment in accordance with this decision.

So ORDERED.