In re DOLLAR TIME GROUP, INC.,
Store No. 22, Inc. a/k/a Dollar Time
Dollar Time, Inc., Debtors.

Kenneth A. WELT, Trustee, Plaintiff,

v.

Joseph SASSON, Individually, Jeffrey
Klansky, Individually,
Defendants.

Bankruptcy Nos. 95–22816–BKC–
RBR, 95–22817–BKC–RBR,
95–23589–BKC–RBR.
Adversary No. 96–0380–BKC–RBRA.

United States Bankruptcy Court,
S.D. Florida.

July 20, 1998.

Ronald Neiwirth, Miami, FL, for Debtors.

Irwin Fingerit, New York City, for Defendants.

Arthur Rice, Miami, FL, for Plaintiff.

RECOMMENDED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

JAMES G. MIXON, Chief Judge.

This cause of action is before the Court upon the complaint of Kenneth A. Welt, Trustee, ("Trustee") alleging that Joseph Sasson ("Sasson") and Jeffrey Klansky ("Klansky") breached their corporate fiduciary duty to Dollar Time Group, Inc. ("Dollar

Time"), a debtor in this jointly administered case. After a trial on the merits in Miami, Florida, on June 16 and September 15, 1997, the matter was taken under advisement.

Jurisdiction of this proceeding is pursuant to 28 U.S.C. §§ 157(a) & 1334. Sasson and Klansky have moved that the Court determine this to be a related, noncore case.

■ The Court agrees that this is a noncore proceeding related to but not arising in or under title 11. A core proceeding invokes a substantive right either provided by title 11 or dependent for its existence upon a bankruptcy environment. *Diamond Mortgage Corp. v. Sugar,* 913 F.2d 1233, 1238 (7th Cir.1990) (quoting *Barnett v. Stern,* 909 F.2d 973, 981 (7th Cir.1990)); *Peterson v. 610 W. 142 Owners Corp. (In re 610 W. 142 Owners Corp.),* 219 B.R. 363, 367 (Bankr. S.D.N.Y.1998) (quoting *In re Leco Enters.,* 144 B.R. 244, 248–49 (S.D.N.Y.1987) *(citing In re Wood,* 825 F.2d 90, 96–97 (5th Cir. 1987))); *Acolyte Electric Corp. v. City of New York,* 69 B.R. 155, 173 (Bankr.E.D.N.Y. 1986), *aff'd,* 1987 WL 47763 (E.D.N.Y. March 27, 1987).

■ In contrast, a noncore proceeding involves non-bankruptcy law claims that are independent of and antecedent to the bankruptcy filing. *Peter J. Schmitt Co. v. Firestone Star Market, Inc. (In re Peter J. Schmitt Co.),* 150 B.R. 556, 558 (Bankr.D.Del. 1993); *Nationwide Roofing & Sheet Metal, Inc. v. Cincinnati Ins. Co. (In re Nationwide Roofing & Sheet·Metal, Inc.),* 130 B.R. 768, 774 (Bankr.S.D.Ohio 1991). A noncore, related proceeding is one that affects the amount of property of the estate or allocation of property among creditors. *Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics, Inc.),* 813 F.2d 127, 131 (7th Cir.1987) (citing *In re Paso Del Norte Oil Co.,* 755 F.2d 421 (5th Cir.1985)); *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994–96 (3rd Cir.1984).

The instant case involves a state law cause of action alleging breach of fiduciary duty. The events giving rise to the cause occurred approximately two years before the pending chapter 7 bankruptcy was filed. Furthermore, the corporation could have pursued the cause even if the Debtor were not in bankruptcy. For these three reasons, the proceeding is noncore.

■ Though noncore, this proceeding is related to the bankruptcy case because the outcome will affect the amount of property of the estate and the extent of allocation to creditors. Numerous courts have characterized cases as both noncore and related when a trustee or debtor-in-possession has assumed the debtor corporation's cause of action against fiduciaries for breach of duty. *See, e.g., Diamond Mortgage Corp. v. Sugar,* 913 F.2d 1233, 1239 (7th Cir.1990) (where chapter 11 debtors sued former attorneys for breach of fiduciary duties, suit was related, noncore); *Mellon v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.),* 122 B.R. 887, 894 (D.Del.1991) (trustee's suit for breach of fiduciary duty by directors of debtor corporation's parent was noncore); *Nationwide Roofing & Sheet Metal, Inc. v. Cincinnati Insurance Co. (In re Nationwide Roofing & Sheet Metal, Inc.),* 130 B.R. 768, (Bankr.S.D.Ohio 1991) (adversary proceeding was related, noncore matter where chapter 11 debtor sued insurer for breach of fiduciary duty).

Because this is a noncore proceeding, the Court submits the following proposed findings of fact and conclusions of law to the district court for de novo review of those matters to which either party has lodged a timely objection. 28 U.S.C. § 157(c)(1) (1994); Federal Rule of Bankruptcy Procedure 9033.

## FACTS

The relevant events precipitating this cause of action occurred between August 1993 and late March 1994, more than a year before Dollar Time filed its chapter 11 bankruptcy in July of 1995. In August 1993, Dollar Time was a publicly held corporation engaged in the retail sales of a broad range of merchandise selling for approximately one dollar. A Nevada corporation headquartered in Hollywood, Florida, Dollar Time operated numerous stores throughout the United States.

During the same period, Sasson and Klansky were 100 percent shareholders and the

principal officers of A Real New York Bargain—Worldwide, Ltd. ("Bargain"), an entity created by Sasson and Klansky to engage in retail sales of men's and women's clothing at a price of approximately $10.00 per unit. Bargain owned and operated about ten stores and franchised another six, all in either Florida or the New York metropolitan area. Sasson and Klansky also owned the outstanding shares of stock and were the principal officers of affiliated corporations whose business concept was similar to that of Bargain.

In August 1993, certain Dollar Time shareholders initiated discussions with Sasson and Klansky about a possible merger between Bargain and its affiliates and Dollar Time. These major shareholders outlined a plan to restructure the management of Dollar Time, make its stores more compatible with Bargain's stores, and expand both entities, thereby increasing profits through the acquisition and merger of Bargain. The proposal entailed Sasson and Klansky selling their respective interests in Bargain and its affiliates to Dollar Time in return for shares of stock in Dollar Time and an agreement that Sasson and Klansky would operate Dollar Time.

On September 2, 1993, a letter of intent was executed between the parties. It provided that upon the consummation of the proposed merger, Sasson and Klansky would receive between them ten million shares of common stock of Dollar Time for their interest in 100 percent of all issued and outstanding securities of Bargain and its affiliates.

On the same date, Sasson entered into a Consulting Agreement with Dollar Time. The Consulting Agreement provided that while Dollar Time and Bargain continued to negotiate terms of a merger agreement, Sasson would act as "managing consultant" to Dollar Time with "authority to manage all aspects of the business of Dollar Time during the term of this agreement." (Trustee's Ex. 4 at 2.) The Consulting Agreement indemnified Sasson against liability for performance of his duties undertaken in good faith and the best interests of the corporation, and stated that New York law would apply to any dispute resulting from the agreement.

Before and during the period of Sasson's management of Dollar Time, the company was in poor financial condition, a circumstance Sasson acknowledged in his testimony. In 1993, before Sasson's and Klansky's involvement, Dollar Time incurred significant operating losses that led to a continual need to raise additional cash from third party sources. Bargain, by contrast, was financially healthy, with cash and equivalents of $640,000.00 and total assets of $3,000,000.00 as of June 1993.

On September 24, 1993, after Sasson's Consulting Agreement was in effect, Bargain borrowed $500,000.00 from Dollar Time as evidenced by a promissory note for that amount and a separate letter agreement captioned "Re: Bridge Loan." (Def.'s Ex. E; Trustee's Ex. 5). The $500,000.00 to fund the loan was supplied by Jordan Belfort, a controlling shareholder of Dollar Time. Bargain agreed to pay five percent per year interest and the note would mature in January 1995.

Testimony conflicts about whether the board had earmarked the funds to pay for goods for Dollar Time inventory and Bargain inventory, whether the funds were to be an inducement to Bargain to enter into the merger, or whether the funds were to be used for other expenses related to the merger. William McConnell, Dollar Time chairman of the board in September 1993, testified that the board did discuss the loan to Bargain at a September meeting. The Letter Agreement stated that the funds were for working capital.

The Letter Agreement granted Dollar Time a security interest in Bargain's assets, accounts receivable, and inventory and required Bargain to file the appropriate financing statements to perfect Dollar Time's lien. Dollar Time prepared the agreement as evidenced by the return address, and the board of directors approved the loan as evidenced by a signature of a representative of Dollar Time at the close of the agreement. A provision of the document stated that the note and Letter Agreement would be construed under New York law. Bargain did not execute or deliver to Dollar Time a formal security agreement, nor were UCC financing statements ever recorded.

Sasson testified that commencing in September 1993, he and other personnel of both Bargain and Dollar Time began traveling around the county to assess the operations of Dollar Time and the business needs of the combined companies. During the ensuing four months, Sasson and Klansky, who remained officers, directors, and sole shareholders of Bargain, supervised the opening of ten new Dollar Time stores and converted eight others to clothing stores while continuing to operate Bargain and its affiliates. Sasson and Klansky had check writing authority and began writing checks on Dollar Time's account as early as October 4, 1993.

Five Bargain employees worked for Dollar Time for varying periods from September 1993 to January 1994. Paul Berman, while on the payroll of Bargain, evaluated, remodeled, and hired new personnel for and instituted new policies at 25 Dollar Time stores in the Northeast. Amy Wendrow, also a Bargain employee, scheduled travel arrangements for several Bargain employees who were traveling to various parts of the country to restructure Dollar Time stores. She also contacted each Dollar Time store daily for product reports and sales evaluations. Bargain's merchandise buyers Mary Jane Tipton and Jeff Dvoor scouted the New York market and other areas of the United States for merchandise for Dollar Time. Bargain's bookkeeper Allison Tau prepared documents required by Dollar Time for the proposed merger and coordinated the books and records of Bargain and Dollar Time.

On November 11, 1993, a formal Stock Purchase Agreement ("Merger Agreement") between Dollar Time and Bargain was executed. The Merger Agreement provided that Sasson and Klansky would transfer their shares of stock in Bargain and its affiliates in return for each receiving 5,750,000 shares of stock in Dollar Time. The closing of the merger was to take place after Christmas and was contingent upon the fulfillment of certain conditions and obligations of the parties as outlined in the Merger Agreement.

Also on November 11, 1993, while remaining shareholders and controlling officers of Bargain, Sasson and Klansky entered into employment agreements with Dollar Time.

Pursuant to his agreement, Sasson was to serve as Chief Executive Officer and chairman of the Board of Directors of Dollar Time at a base annual salary of $300,000.00. Under his employment agreement, Klansky was designated president of Dollar Time and a board member and would also receive a base annual salary of $300,000.00.

From late October 1993 through early January 1994, substantial funds were transferred from Dollar Time to Bargain or its affiliates or to third parties for the benefit of Bargain and its affiliates. These transfers totaling $1,792,298.61 were exclusive of the $500,000.00 loan made to Bargain in September and were made from Dollar Time's Exte Bank account in New York City opened after Sasson and Klansky commenced working for Dollar Time.

Entries on Dollar Time's ledger sheets characterized nine of these transfers as loans to either Bargain or to two of Bargain's affiliates, Skorts, and Global Apparel. Checks written on Dollar Time's Exte account directly to Bargain evidenced other transfers. Sasson explained that some of the transactions were either advances to buy goods for Dollar Time or reimbursements for moneys expended by Bargain to purchase goods for Dollar Time. When asked about certain of the "loans," Sasson admitted he could not recall the specific purpose of the transfer, but he also testified that Gary Kaminsky, chief financial officer of Dollar Time, approved the transfers.

The evidence also reflected that not only were transfers made directly to Bargain and its affiliates, but checks were written on the Dollar Time Exte Bank account to pay rent for Bargain stores. Check numbers 1050 to 1059, written on Dollar Time's Exte Bank account on January 3, 1994, paid rental fees for space occupied by Bargain offices or stores. These checks, all dated the same day, totaled $182,291.37.

On January 12, 1994, approximately two months after execution of the Merger Agreement and Employment Agreements, Dollar Time terminated the Merger Agreement, and Sasson and Klansky resigned their positions as officers and directors of Dollar Time. The

testimonies of various witnesses posit several reasons for the termination, including differences in management style, Bargain's lack of financial profitability, disappointing Christmas sales, and dismay over transfers of funds from Dollar Time to Bargain.

After the termination of the Merger Agreement and the resignation of Sasson and Klansky, the parties engaged in protracted discussions aimed at reconciling amounts claimed due and owing from Bargain to Dollar Time. These discussions culminated in a Settlement Agreement dated February 16, 1994. In the Settlement Agreement Bargain and its affiliates acknowledged their indebtedness to Dollar Time on the $500,000.00 promissory note of September 24, 1993, and $1,792,298.61 evidenced by the series of checks and wire transfers from Dollar Time to Bargain and its affiliates or to third parties on Bargain's behalf from October 1993 to January 1994.

The Settlement Agreement provided that the $1,792,298.61, acknowledged as loans or advances by Dollar Time to Bargain, would be satisfied as follows:

(1) Bargain would receive a credit of $500,000.00 for services performed by Bargain and its principals, officers and employees, including but not limited to consulting fees, and for costs and expenses related to the proposed acquisition of Bargain.

(2) Bargain would receive a credit of $412,546.00 for 91,677 units of inventory held by Dollar Time at its distribution center in North Carolina. The parties agreed to value the inventory at $4.50 per unit.

(3) Bargain would be obligated to deliver to Dollar Time on or before May 1, 1995, additional inventory having a value of at least $879,752.61. Bargain was required to verify the fair market value of the inventory through an independent appraisal by an expert approved by both parties.

The Settlement Agreement also provided for a restructuring of the $500,000.00 promissory note of September 1993 that became due in full according to its terms on January 15, 1995. The restructuring required that the principal of $125,000.00 plus interest would be paid on January 15, 1995, and the balance of principal and interest would be paid in twelve equal installments beginning February 15, 1995, and terminating January 15, 1996.

The Settlement Agreement provided that New York law would apply as to the construction of its terms. Gary Kaminsky signed the agreement in his capacity as chief financial officer of Dollar Time, and Sasson and Klansky signed on behalf of Bargain and its affiliates. In late March 1994, the parties agreed that Charles T. Rosoff would appraise inventory held by Bargain to be shipped to Dollar Time to satisfy the $879,752.61 indebtedness acknowledged by Bargain and Dollar Time under the Settlement Agreement. Rosoff's report valued the merchandise shipped from Bargain to Dollar Time at a fair market value of $863,553.00. The shipment of inventory was accepted by Dollar Time employees at the company's North Carolina warehouse. The record reflects no other shipments of clothing from Bargain to Dollar Time.

With respect to the restructured $500,000.00 loan, Bargain failed to be make the scheduled payments beginning in January 1995. Bargain and Dollar Time subsequently agreed that in lieu of payment, Bargain's affiliate would sublease retail space in a Seacaucus, New Jersey retail center to Dollar Time for five years, during which time rents from Dollar Time to Bargain would be waived. This arrangement was to have saved Dollar Time $500,000.00 in rents over the five-year term of the sublease. Contemporaneous with the sublease, dated April 27, 1995, Bargain signed a confession of judgment and in exchange, Dollar Time released its lien on Bargain's assets.

Bargain prepared the space for retail use at a cost of at least $7,500.00, and Dollar Time opened and operated a store at that location sometime between May and July of 1995. On July 24, 1995, Dollar Time Group and Store Number 22 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On September 14, 1995, Dollar Time, Inc. filed for chapter 11. Pursuant to a court order, the three cases were consolidated for joint administration. On January 3, 1996, the cases were converted to cases under chapter 7 of the Bankruptcy Code, and

244

Kenneth Welt was appointed trustee. Dollar Time's Seacaucus store was closed in December, 1995.

### · PARTIES' ARGUMENTS

The Trustee argues that Sasson and Klansky owed a fiduciary duty to Dollar Time and that the $500,000.00 loan and other transfers from financially-troubled Dollar Time to Bargain at a time when Sasson and Klansky were fiduciaries of both corporations establish a prima facie case of self-dealing by fiduciaries. He contends that Sasson and Klansky have not met their burden to prove the inherent fairness of these transactions to Dollar Time and thus that they are liable for breach of fiduciary duty.

First, Sasson and Klansky urge the Court to exclude Plaintiff's Exhibits 20–21, which are ledger sheets, checks and reconciliations documenting transfers from Dollar Time to Bargain. They argue that the Trustee's original complaint alleges only one "debt" owed by Sasson and Klansky to Dollar Time, a "loan" on November 11, 1993. Sasson and Klansky argue that the exhibits evidence transfers not alleged in the complaint, and thus admission would constitute unfair surprise.

As to the breach of fiduciary duty charge, Sasson and Klansky counter that the September loan was a bona fide loan evidenced by an executed note and secured by substantial assets of Bargain and that it was an arm's length transaction entered into when Sasson and Klansky were neither shareholders nor directors of Dollar Time. They also state that the advances from Dollar Time in October, November and December did not constitute breach of fiduciary duty because they were made in good faith, with knowledge of the corporation, and in the best interests of Dollar Time. Sasson and Klansky argue that the plaintiff failed to prove that no person of ordinary sound business judgment would have taken the actions complained of. They also urge that under the intrinsic fairness standard the transfers were fair and reasonable to the corporation because the transferred funds were used to buy inventory for Dollar Time.

Finally, Sasson and Klansky argue that the Settlement Agreement of February 16, 1994, constituted an accord and satisfaction between the parties, and that the sublease in Seacaucus, New Jersey represented valuable consideration to discharge Bargain's debt under the note.

### CONTROLLING LAW

■ As a threshold matter, the Court must decide what law controls. Because breach of fiduciary duty of corporate directors is a state law cause of action, state law, specifically, the law of the forum, applies. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Sasson and Klansky argue that because the letter agreement documenting the September loan, the consulting agreement, merger agreement, employment agreements, and the settlement agreement of February 16, 1994, provide for their construction under New York law and because all relevant transactions occurred in New York, the law of New York should apply to this claim. The Trustee does not specifically respond to this argument but in his memorandum to the Court cites numerous cases from Nevada, the place of incorporation of Dollar Time; from Florida, where Dollar Time is headquartered; and from New York, where the relevant transactions occurred.

Given these circumstances, a Florida court would probably apply the choice of law rules of the Restatement (Second) of Conflicts. *International Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n. 19 (11th Cir.1989). Under the Restatement, courts will permit parties to choose the state law that will govern their contractual rights and duties even if the issue for determination is one that the parties could not have resolved by terms of the agreement. Restatement of Conflicts (Second) § 187 (1971). This is so unless the chosen state has no substantial relationship to the parties or the transaction and no other reasonable basis for the parties' choice exists or unless application of the chosen state's law would be contrary to a fundamental policy of a state that has a materially greater interest than the chosen state. Restatement of Conflicts (Second) § 187 (1971).

The chosen state, New York, does have a substantial relationship to the parties and the transactions. The parties negotiated and signed various agreements in New York and performance of those agreements frequently took place there as well. Bargain operated several stores and maintained offices in the New York metropolitan area; moreover, Dollar Time's attorneys advising the corporation about the proposed merger were situated in New York.

The laws of the state of Nevada, the state of incorporation, would typically be applicable in this case, but no other material relationship exists between Nevada and the parties. Although the state of Florida, the forum state, also has a material interest in the case, applying New York corporate law is not contrary to fundamental policy in Florida, and in fact, the two states' bodies of corporate law are similar. Moreover, courts interpreting Florida law have on occasion deferred to the choice of law provisions stated in contracts between the parties. *See, e.g., Citi–Lease Co. v. Entertainment Family Style, Inc.*, 825 F.2d 1497, 1499 (11th Cir.1987).

## ADMISSION OF PLAINTIFF'S EXHIBITS 20–21

█ Next, the Court must determine whether to admit Plaintiff's Exhibits 20–21 over the objections of Sasson and Klansky. The Court recommends admission for the following reasons. Counsel for Sasson and Klansky first objected to the introduction of the exhibits at trial, although the Court's Pre–Trial Order of March 27, 1997, required the parties to submit all exhibits and objections prior to trial. Objections not submitted by the Court's deadline would be deemed waived. Although the Trustee did not timely tender his exhibits, Sasson and Klansky's counsel, by his own admission, received copies of the exhibits approximately five days prior to trial, giving him time to examine the documents and lodge a written objection in advance of trial.

Furthermore, the Trustee's inaccurate characterization in the complaint of the $1,729,298.61 debt as arising from a single "loan" rather than from a series of transac-

tions was not so misleading as to result in unfair surprise to Sasson and Klansky such that they would not have expected to have to defend the separate transactions as documented by the exhibits at issue. Moreover, the Trustee relied on the admission of these documents to establish his case in chief. To reverse that ruling would work substantial prejudice to his case.

## BREACH OF FIDUCIARY DUTY

A fiduciary duty is the responsibility to act for the benefit of another while subordinating one's personal interests to that of the other person and is the highest standard of duty implied by law. Black's Law Dictionary 625 (6th ed.1990).

█ Corporate directors and officers owe specific fiduciary duties to the corporations and shareholders they serve. N.Y.Bus.Corp. Law § 717 (McKinney 1986); *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (citing *Twin–Lick Oil Co. v. Marbury*, 91 U.S. 587, 588, 23 L.Ed. 328 (1875)); *In re Happy Time Fashions, Inc.*, 7 B.R. 665, 670 (Bankr.S.D.N.Y.1980) (citing *In re India Wharf Brewery*, 96 F.2d 710 (2d Cir. 1938); *In re Los Angeles Lumber Products Co.*, 46 F.Supp. 77, 88 (S.D.Cal.1941); *In re McCrory Stores Corp.*, 12 F.Supp. 267, 269 (S.D.N.Y.1935)); *Giblin v. Murphy*, 73 N.Y.2d 769, 536 N.Y.S.2d 54, 532 N.E.2d 1282, 1283–84 (1988); *Schmidt v. Magnetic Head Corp.*, 101 A.D.2d 268, 476 N.Y.S.2d 151 (Sup.Ct.1984) (citing *Pepper*, 308 U.S. at 306, 60 S.Ct. 238); *Schachter v. Kulik*, 96 A.D.2d 1038, 466 N.Y.S.2d 444, 446 (Sup.Ct. 1983), *appeal dismissed, Matter of Carlton G.*, 61 N.Y.2d 758, 472 N.Y.S.2d 1030, 460 N.E.2d 1363 (1984). These fiduciary obligations include the duty of care, which is the responsibility to exercise the care of a reasonably prudent person in a similar position under similar circumstances, and the duty of loyalty, which proscribes unfair self-dealing. *Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d 255, 264 (2d Cir.1984).

█ In evaluating a fiduciary's duty of care, courts apply the business judgment rule, which bars judicial inquiry into a corporate fiduciary's actions taken in good faith

and in the exercise of honest judgment to further the corporation's purposes, even if hindsight reveals that conduct was unwise. *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 1000 (1979); *Pollitz v. Wabash R.R. Co.,* 207 N.Y. 113, 100 N.E. 721, 724 (1912). A presumption of propriety inures to the benefit of the corporate fiduciary, and the initial burden of proving breach of fiduciary duty rests with the plaintiff. *Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 273 (2d Cir.1986).

 As stated above, corporate fiduciaries owe not only a duty of care shielded by the business judgment rule but also a duty of loyalty requiring rigorous scrutiny of self-dealing. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939). The business judgment rule protects directors only to the extent that directors have no self-interest in the transaction at issue. *Norlin Corp. v. Rooney, Pace, Inc.,* 744 F.2d 255, 265 (2d Cir.1984) (citing *Treadway Cos., Inc. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir. 1980)).

 A transaction between a corporation and a director who has a financial interest in such transaction is voidable by the corporation unless the director's interest is disclosed and either the shareholders or the board, excluding the interested director, approves the transaction. N.Y.Bus.Corp. § 713(a)(1)(2) (McKinney 1986). If proper approval has not been received, the interested director must affirmatively prove the transaction was fair and reasonable to the corporation. N.Y.Bus.Corp.Law § 713(b) (McKinney 1986). Thus, a prima facie showing of director self-interest in a particular corporate transaction without board or shareholder approval shifts the burden to the director to demonstrate the transaction was fair and in the best interests of the corporation and not a breach of the fiduciary duty of loyalty. *Norlin Corp.,* 744 F.2d at 264 (citations omitted).

Corporate self-interest or self-dealing by a fiduciary takes many forms. *See, e.g., S. & K. Sales v. Nike, Inc.,* 816 F.2d 843 (2d Cir.1987) (manufacturer participating in employee's breach of fiduciary duty to employer was liable for damages); *Norlin Corp. v.*

*Rooney, Pace Inc.,* 744 F.2d 255 (2d Cir. 1984) (stock transferred to stock option plan and to subsidiary to solidify management's control over corporation created inference of self-dealing); *Lewis v. S.L. & E., Inc.,* 629 F.2d 764 (2d Cir.1980) (directors of both lessor and lessee corporations were not disinterested as to the lease agreement between the corporations). *Ault v. Soutter,* 204 A.D.2d 131, 611 N.Y.S.2d 187 (Sup.Ct.1994) (director acquiescing in improper loan to co-director was accountable for breach of fiduciary duty).

## THE SEPTEMBER LOAN

 The Trustee alleges that Sasson and Klansky breached their fiduciary duty by accepting, on Bargain's behalf, a loan for $500,000.00 on September 24, 1993, from the financially struggling Dollar Time. In fact, at the time of the loan, Sasson and Klansky did have dual roles in the two companies involved in the transaction, serving both as employees of Dollar Time and as directors, officers and shareholders of Bargain. As such, the two owed fiduciary duties to both corporations. *See, e.g., S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 850 (2d Cir.1987) (holding employee was required to act with utmost loyalty and good faith in performing his duties to the corporation) (citations omitted).

Even if Sasson and Klansky qualify as fiduciaries to Dollar Time as early as September 1993, there is evidence that the loan was made with approval of the board and a controlling shareholder. Although the record does not contain board minutes reflecting approval of the loan, the note and letter agreement were prepared by Dollar Time attorneys and the letter agreement was signed by an agent of the corporation. Furthermore, Bargain promised to pay interest on the loan, and the loan was secured to the extent of approximately $3,000,000.00 in Bargain assets, circumstances that support the fairness of the transaction to Dollar Time.

The loan appears to be a board-approved, arm's length transaction between Dollar Time and Bargain whereby Dollar Time used the funds as an inducement to Bargain, which in turn may have needed working capi-

tal, at a time when a merger of the two corporations was contemplated. The Court finds Sasson and Klansky breached no fiduciary duty in participating in this transaction.

## OCTOBER–JANUARY TRANSFERS

■ In the Settlement Agreement, Bargain stipulated that it had received other loans and advances from Dollar Time totaling $1,792,298.61. Trustee's Exhibit 20 includes Dollar Time ledger sheets documenting numerous loans and checks from Dollar Time to Bargain and copies of checks written by Sasson and Klansky on Dollar Time's account to Bargain, its affiliates, or third parties for the benefit of Bargain from October 1993 through January 1994.

The evidence shows that during the October to January period, Gary Kaminsky, Chief Financial Officer for Dollar Time, transferred funds to Dollar Time's Exte Bank checking account in New York. Allison Tau, a bookkeeper for Bargain, also kept certain Dollar Time ledger sheets documenting transfers from the Exte account. The notation "loan" adjacent to nine of the entries reflected that Dollar Time funds were received by Bargain or its affiliates as loans or transfers. The evidence also demonstrates numerous checks written on the Dollar Time account to Bargain or its affiliates.

Sasson verified that he was aware of the various transfers and further testified that the transfers characterized as "loans" on the books were actually advances to Bargain for the purchase of inventory for Dollar Time and/or Bargain. However, Sasson and Klansky did not introduce into evidence any invoices or other documents to substantiate Sasson's testimony that the transfers benefitted Dollar Time. Although Sasson and Klansky argue that the transfers were made with the Dollar Time board's knowledge, there are no board minutes in evidence to show that Sasson and Klansky had disclosed the transfers to the board or shareholders or that the transfers were in fact approved by a sufficient vote of either the board or shareholders.

These transfers began in October when Sasson and Klansky were immersed in operating the two companies, when other Bargain employees had begun working full time for Dollar Time under Sasson's and Klansky's direction, and when Sasson and Klansky had begun to exercise their check writing authority to disperse funds from Dollar Time to Bargain. The Court finds that by October 1993, by virtue of their authority to operate the company and sign checks, Sasson and Klansky had attained the status of fiduciaries owing a duty to Dollar Time. Furthermore, from November 11, 1993, until January 12, 1994, Sasson and Klansky were fiduciaries to Dollar Time by virtue of their status as officers and board members of Dollar Time.

As fiduciaries, they owed the highest duty of loyalty implied by law. Because of this duty, any self-dealing by them must be judged not by the reasonably prudent standard of the business judgment rule, but by the intrinsic fairness test, that is, whether Sasson and Klansky proved their transactions were fair and reasonable to the corporation. Clearly, the answer is no.

The nine loans reflected on Dollar Time's books and the checks written to Dollar Time, its affiliates, and to third parties for the benefit of Bargain are transactions in which Sasson and Klansky had an interest because Sasson and Klansky's companies received the money or benefit. Such transactions amount to self-dealing.

The record reflects no evidence that the transfers were disclosed to the board or shareholders or that the board or shareholders approved the transfers. The only evidence of board participation in these transfers is that Dollar Time's chief financial officer, Gary Kaminsky, transferred substantial Dollar Time funds to Dollar Time's Exte Bank account, but nothing in the record suggests Kaminsky or anyone else in a position of authority at Dollar Time, other than Sasson and Klansky, knew of the transfers from Dollar Time's account to Bargain and its affiliates. Therefore, under section of New York's Business Corporations Law, the corporation could have voided the transactions unless Sasson and Klansky proved they were fair and reasonable to the corporation.

248

The transfers fail the fair and reasonable test because they were made when Dollar Time was experiencing cash flow difficulties and was resorting to bridge loans from outside sources to continue to operate. Although Sasson and Klansky argue that the transfers of funds were used for the purchase of inventory for Dollar Time, they introduced into evidence no documents to verify this assertion. ·Furthermore, the ledger sheets clearly document checks written in January 1994 for rents due on Bargain stores. Thus, Sasson and Klansky have failed to meet their burden of proving the self-dealing transactions were fair and reasonable to Dollar Time and are liable for breach of fiduciary duty by transferring $1,792,298.61 from Dollar Time to Bargain.

## ACCORD AND SATISFACTION

Sasson and Klansky argue that even if they are liable to Dollar Time for breach of fiduciary duty, the settlement agreement be-'tween Dollar Time and Bargain represented an accord and satisfaction releasing Bargain and Sasson and Klansky from further obligation to Dollar Time.

An accord and satisfaction is a form of contract in which the parties agree to give or accept what is offered in settlement of an outstanding claim in contract or tort. The claim is satisfied upon performance of the agreement. *City of Amsterdam v. Daniel Goldreyer, Ltd.,* 882 F.Supp. 1273, 1279–80 (E.D.N.Y.1995) (citing N.Y.Jur.2d, Compromise, Accord, and Release § 1); *Pepper's Steel & Alloys, Inc. v. Lissner Minerals & Metals, Inc.,* 494 F.Supp. 487, 496 (S.D.N.Y. 1979) (citing *McMahon v. Pfister,* 39 A.D.2d 691, 332 N.Y.S.2d 591 (1972)). Whether an accord has been reached depends on the parties' expressions of intent. *Pepper's Steel & Alloys, Inc.,* 494 F.Supp. at 497 (citing *Werking v. Amity Estates, Inc.,* 2 N.Y.2d 43, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956)). An accord and satisfaction cannot be reached between parties other than those who were party to the original contract or claim. *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 736 F.Supp. 1281, 1284 (S.D.N.Y.1990), *aff'd,* 925 F.2d 566 (2d Cir. 1991) (citing *Stahl Management Corp. v.*

*Conceptions Unlimited,* 554 F.Supp. 890, 892 (S.D.N.Y.1983); Restatement (Second) Contracts 280, Comment a.) Accord and satisfaction is an affirmative defense in which the asserting party bears the burden of proof. *Amsterdam,* 882 F.Supp. at 1280; *Stahl Management Corp. v. Conceptions Unlimited,* 554 F.Supp. 890, 893 (S.D.N.Y.1983) (citing *Reilly v. Barrett,* 220 N.Y. 170, 115 N.E. 453, 454 (1917)); *Studiengesellschaft Kohle v. Novamont Corp.,* 485 F.Supp. 471, 475 (S.D.N.Y.1980) (citing *Geeslin v. Knight Bros., Inc.,* 554 F.2d 865, 866 (8th Cir.1977); *Simpson v. Norwesco,* 442 F.Supp. 1102 (D.S.D.1977), *aff'd,* 583 F.2d 1007 (8th Cir. 1978)).

While it is true that the Settlement Agreement did represent an accord to settle all claims between Dollar Time and Bargain, the Agreement contained no expression of an intent to settle the claims between Dollar Time and Sasson and Klansky individually. .Further, Sasson and Klansky were indemnified for liability incurred by authorized acts only; the indemnification specifically excluded acts that breached fiduciary duty to Dollar Time. Because the parties to the Settlement Agreement were Dollar Time and Bargain, the Agreement does not document an accord and satisfaction between the parties to this action.

## THE TRUSTEE'S RECOVERY

The commencement of a bankruptcy case creates an estate comprising all legal or equitable interests of the debtor in property of the estate, including the debtor's interest in a cause of action. 11 U.S.C. § 541(a)(1) (1994). Under title 11, a trustee is successor to the debtor's interest in property of the estate and may pursue the debtor's cause of action. 11 U.S.C. § 541 (1994).

Upon a corporation's bankruptcy, any claim the debtor corporation has against directors for breach of fiduciary duty passes to the bankruptcy estate. *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),* 195 B.R. 971, 985 (Bankr.D.Mass.1996); *Hassett v. McColley (In re O.P.M. Leasing Servs. Inc.),* 28 B.R. 740, 759 (Bankr.S.D.N.Y.1983) (citing *In re Happy Time Fashions, Inc.,* 7

B.R. 665 (Bankr.S.D.N.Y.1980)). Thus, as successor to the debtor's interest in a cause of action that passes to the estate, the trustee stands in the shoes of a debtor corporation and is authorized to bring a suit for breach of fiduciary duty against the corporation's directors. *Mixon v. Anderson (In re Ozark Restaurant Equip. Co., Inc.)*, 816 F.2d 1222, 1225 (8th Cir.1987), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *Brandt*, 195 B.R. at 985.

■ A basic concept of fairness prohibits a double recovery by any debtor. *Towne Realty, Inc. v. A–1 Hydro Mechanics Corp. (In re A–1 Hydro Mechanics Corp.)*, 92 B.R. 451, 457 (Bankr.D.Hawai'i 1988) (citing *In re Mohawk Industries, Inc. v. United States*, 82 B.R. 174, 178 (Bankr.D.Mass.1987)). Because the trustee stands in the shoes of the debtor as to the debtor's cause of action, he may not recover those damages previously received by the debtor. To permit such an outcome would result in a double recovery.

■ Substantial evidence in the record supports the finding that Dollar Time recovered from Bargain the equivalent of $1,276,109.50 in inventory under the Settlement Agreement of February 16, 1994. Dollar Time and Bargain agreed to a credit of $412,546.50 on Bargain's debt to Dollar Time for inventory in Dollar Time's North Carolina warehouse. Testimony and exhibits confirmed that Bargain customarily paid a wholesale price of between $4.50 and $6.00 per unit of clothing. Nothing in the record reflects that the inventory was worth less than that amount.

Dollar Time also received inventory with an appraised value of $863,563.00 shipped by Bargain to Dollar Time's North Carolina warehouse March 24, 1994. The independent appraiser of the inventory was approved by Dollar Time's attorneys, and his report was placed in the record. Although the Trustee now takes issue with the value of the inventory by demonstrating that Dollar Time later listed the inventory for accounting purposes at only $63,000.00, he introduced no persuasive evidence that questioned either the number of items shipped or the value placed by the appraiser on each item when the items were shipped.

Therefore, Sasson's and Klansky's liability for $1,792,298.61 for breach of fiduciary duty to Dollar Time shall be reduced by $1,276,109.50, the value of the inventory previously received by Dollar Time as partial compensation for the transfers at issue. To award the Trustee an amount Dollar Time has already received would equate to a double recovery and a windfall to the debtor. Expressed another way, Sasson and Klansky have no liability for $1,276,109.50 because Dollar Time has been previously made whole to that extent.

■ Also under the Settlement Agreement, Bargain received a credit of $500,000.00 for services performed by Bargain and its principals, officers and employees, including consulting fees, and for costs and expenses related to the proposed acquisition of Bargain. Testimony evidenced that Sasson, Klansky, and five other Bargain employees worked for Dollar Time for varying periods between September 1993 and January 1994. Dollar Time initially paid Sasson a consulting fee of $5000.00 a month; he later received $300,000.00 a year after he became Chief Executive Officer. Both Sasson and Klansky received compensation for their services to Dollar Time during their employment, but the other Bargain employees did not.

The record does not reflect what salary or hourly wage was paid to the five Bargain employees during the September–January period. Similarly, the record is void of testimony or documents relating to Bargain's expenses resulting from the proposed merger. Consequently, the Court must conclude that these salaries and expenses were of de minimus value to Dollar Time. Therefore, reducing the Trustee's recovery by the $500,000.00 credit in the settlement agreement would be unfair because Dollar Time actually received nothing of value under this term of the settlement.

## CONCLUSION

For the reasons stated, the Court recommends, pursuant to 28 U.S.C. § 157(c)(1), that Sasson and Klansky be held liable for

breach of fiduciary duty to Dollar Time for the sum of $516,189.11.

IT IS SO ORDERED.